### E. K. HARDISON SEED CO. v. JONES, War Food Adm'r.
### No. 9893.

Circuit Court of Appeals, Sixth Circuit.

May 14, 1945.

William Waller, of Nashville, Tenn. (Armistead, Waller, Davis & Lansden, of Nashville, Tenn., on the brief), for petitioner.

John T. Grigsby, of Washington, D. C. (Tom C. Clark, of Washington, D. C., Byron B. Harlan, of Cincinnati, Ohio, and Vincent A. Kleinfeld and John T. Grigsby, both of Washington, D, C., on the brief), for respondent,

Before HICKS, HAMILTON, and MARTIN, Circuit Judges.

HAMILTON, Circuit Judge.

Petitioner is a partnership doing business under the firm name, E. K. Hardison Seed Company, and during the period of time involved here was engaged in the business of selling agricultural seeds and shipping them in interstate commerce.

In the years 1941 and 1942, petitioner made numerous shipments in interstate commerce of seeds in bags with labels on each showing the noxious-weed content and the germination percentage of the seed.

In a proceeding under the Federal Seed Act of August 9, 1939, 53 Stat. 1275, 7 U.S.C.A. § 1551 et seq., and the rules and regulations promulgated pursuant thereto (7 C.F.R. 201.1 et seq.), the War Food Administrator found that petitioner had violated 7 U.S.C. § 1571 by shipping in interstate commerce bags of seeds falsely labeled. Predicated on fact findings and pursuant to 7 U.S.C.A. § 1599, the Administrator issued an order directing petitioner to cease and desist from shipping or delivering for transportation to another State, agricultural seeds to which were attached labels containing false statements or labels not showing the presence of any seeds considered seeds of a noxious weed by the law of the State to which the seeds were shipped, if such noxious-weed seeds were present.

Petitioner seeks a review of the Administrator's order under 7 U.S.C.A. § 1600, praying that it be set aside on the ground that the Administrator's conclusions, order and relief lack necessary support in the evidence and that the order lacks statutory authority.

Under 7 U.S.C.A. § 1571, the channels of interstate commerce are closed to all agricultural seeds or mixtures thereof for seeding purposes, unless each container bears a label giving information in accordance with rules and regulations promulgated by the statutory administrator showing (a) the percentage of weight of weed seeds including noxious-weed seeds; (b) the kinds of noxious-weed seeds and the rate of occurrence of each, which rate shall be expressed in accordance with and shall not · exceed the rate allowed for shipment, movement or sale of such noxious-weed seeds by

the law and regulations of the State into which the seed is offered for transportation or transported, or in accordance with the rules and regulations of the Secretary of Agriculture determining that weeds, other than those designated by State requirement, are noxious; (c) percentage by weight of inert matter; (d) the percentage of germination exclusive of hard seed and also the percentage of hard seed if present.

The statute authorizes the Administrator to prescribe rules and regulations as to samplings, analyses, tests and examinations of seeds made in connection with the administration of the statute and to prescribe reasonable tolerances as to percentages of germination and rates of occurrences of noxious-weed seeds or other foreign substances, 7 U.S.C.A. §§ 1592, 1593.

The Administrator promulgated regulations prescribing rules for testing and also tolerances. Part 201, Federal Seed Act Regulations (7 F. R. Cumulative Supplement, 1943).

The present order is based on six shipments by petitioner; (a) two shipments to Alabama customers and one shipment to a Georgia customer, of lespedeza seeds, all containing a higher rate of occurrence of dodder seed than shown on the labels affixed to the bags; (b) two shipments to Alabama customers of rye seeds with a lower percentage of germination than shown on the labels affixed to the bags; (c) one shipment to an Alabama customer of wheat seed containing corn cockle seed, a noxious-weed seed under the laws of Alabama, not mentioned on the labels affixed to the bags.

The evidence concerning the lespedeza shipment to Alabama was that of an inspector for the State of Alabama, who testified that he took samples out of each of 80 bags shipped by petitioner to Stegall-Sylvest Seed Company of Montgomery, Alabama, and in turn shipped by the latter to the Alabama Mercantile Company of Birmingham. The samples were taken at the Alabama Mercantile Company by the inspector and consisted of approximately four ounces each out of 125-pound bags, and were forwarded by the inspector to the Seed Analyst of the State of Alabama. In the office of the latter official these samples were commingled and the mass divided into subsamples and analyzed. One of the subsamples contained less weed seed per pound than was shown on the label and another contained more.

The shipment to the Georgia customer was sampled by a field employee of the Food Distribution Administration of the United States on the premises of the Atlanta Seed Company, consignee. The sample contained approximately fifty grams and was afterward placed in a sealed package and sent by mail to the Federal Seed Laboratory at Montgomery, Alabama, where it was labeled. An associate seed technologist in charge of the administration of the Federal Seed Act at the Federal State Seed Laboratory at Montgomery, Alabama, introduced in evidence a copy of the original record kept in his office showing the result of the analysis of the samples sent in by the inspector. The witness had not made the analysis and was unable to testify as to who did. The analyst who made the test did not testify but the report which was made a part of the evidence showed a higher dodder seed content than was on the label.

On November 20, 1941, petitioner shipped 20 bags of rye seed to the Morgan County Exchange, Hartselle, Alabama, with labels on each bag representing that the germination of the seed was 88 percent. On November 24, 1941, a commodity inspector for the Agricultural Department of the State of Alabama removed from ten of these bags, samples aggregating two pounds and mixed these samples and forwarded the mixture to the State Seed Analyst of Alabama, who had the composite sample analyzed in his office between December 1st and 12th, 1941, and there was found a germination of 62 percent.

On September 25, 1942, petitioner shipped to J. T. Whatley, Jr., Dothan, Alabama, 20 bags of rye seed containing labels representing germination of 90 percent.

On October 9, 1942, the Alabama inspector took samples from eight of the 20 bags of rye seed on the premises of J. T. Whatley, Jr., and mailed the composite sample to the State Seed Laboratory under seal. An analysis of this sample in the office of the State Seed Analyst showed a germination of 60 percent.

On October 22, 1942, petitioner shipped to the Talladega County Exchange, Talladega, Alabama, 8 bags of wheat seed containing labels representing that cheat seed was the only noxious-weed seed in the bag. On October 29, 1942, an inspector for the State Department of Agriculture for the State of Alabama took samples from six of

these bags and mailed the composite sample to the Seed Control Laboratory at Birmingham, Alabama. An analysis of the composite sample was made in the office of the State Seed Analyst where it was found that each of the bags contained forty-one corn cockle seeds per pound. Corn cockle was defined by Alabama law to be a noxious weed.

Petitioner introduced in evidence the original report of its seed analyst on all of the seeds here in question. At the time of the hearing he was in the Armed Forces of the United States and was not available as a witness.

The practice of petitioner was to sack and stack its seed as they ran from the cleaner and to give a quantity thereof a lot number. Petitioner's analyst took samples out of each bag in a lot and mixed them and analyzed the mixture. One hundred seeds were analyzed for the purpose of determining the germination. One of petitioners' partners testified that petitioners' analyst followed the rules and practices of the Commercial Analysts' Association. The rules and regulations of this association are not in the record. The original labeling on the bags of seed here in question conform to the report of petitioner's analyst.

The statutory regulations define a lot of seed to mean a definite quantity of seed identified by a lot number, every portion of bag of which is uniform within permitted tolerances for the factors which appear in the labeling [7 F. R. Part 201, Sec. 201.1 (v)]. Section 201.37 authorizes qualified state officials to draw samples, secure information and records pertaining to, and otherwise inspect seed and screenings subject to the Act. Section 201.39 provides that in order to secure a representative sample, equal portions shall be taken from evenly distributed parts of the quantity of seed or screenings to be sampled and in obtaining the samples from free-flowing seed in bags or bulk, a probe or trier shall be used and the portions taken shall be combined into a composite sample. Section 201.41 provides that in quantities of five bags or less, each bag shall be sampled and, where the quantity is more, at least every fifth bag, but not less than five bags, shall be sampled. Section 201.43 provides that the size of the sample to be submitted for analysis, test or examination shall be not less than two ounces of grass seed not otherwise mentioned, white or alsike clover or seeds not larger than these, five ounces of red or crimson clover, alfalfa, rye grasses, brome grasses, millet, flax, rape or seeds of similar size.

Section 201.45 provides that working samples on which the actual analysis is made shall be taken from the submitted samples in such manner as that it will be representative and the sample shall be repeatedly divided to the weight to be used for the working sample and weighed. Five grams shall be used for rye grass, meadow fescue, foxtail millet, alfalfa, red clover, sweet clovers and lespedeza.

Section 201.52 provides that in determining the number of seeds of individual noxious weeds present per unit weight, the samples shall be not less than fifty grams.

Section 201.53 provides that in making germination tests the seeds for germination shall be taken from the separation of the kind, variety or type considered pure seed and shall be counted without discrimination as to size or appearance and that at least four hundred seeds shall be tested for germination, the four hundred to be divided into lots of not less than one hundred seeds and that retests shall be made if there is a difference of ten percent between any two of the separate hundreds of seeds tested when the average of the test is 80 percent or above, or if there is a difference of 15 percent when the average is below 80 percent. The regulations schedule tolerances both as to germination and noxious-weed seed content, which regulations we feel it unnecessary to set out in detail here. Suffice it to say that the seeds in question when placed in interstate shipment were within the regulations' tolerances based on petitioner's analyses, but were without the tolerances according to the reports of analyses of officials of Alabama and of the Federal Government. The officials ot the Federal Government and the State of Alabama followed the regulations substantially in the method of taking samples and making the analyses. There is no evidence in the record that petitioner's analyst followed the Government regulations substantially in obtaining samples on which his analyses were based.

Petitioner urges that a lack of uniformity in weed seed content and the germination percentage in different samples taken from the same lot of seed at different times is no evidence that the bags in which the seeds were shipped were falsely labeled.

Human experience has taught us that one thing concurrently may be associated with another. In other words, the presence of smoke indicates the presence concurrently of fire. Thus it is that samples are receivable in evidence to show the quality or condition of the entire lot or mass from which they are taken. The prerequisites necessary to the admission in evidence of samples are that the mass should be substantially uniform with reference to the quality in question and that the sample portion should be of such nature as to be fairly representative. The samples in the case at bar were taken from the very mass of seeds in issue although at different times. The difference in time of the taking of the samples is not material, although usually there is some change in germination over a long period. No showing is made that the use of a composite sample for comparison would produce a result substantially different from comparison of a sample of each container of grain with an original average sample and within the periods of time involved. In our opinion the samples and analyses in question constitute competent and substantial evidence that petitioner had falsely labeled its products transported in interstate commerce. The weight of the evidence was for the Administrator.

The Federal Seed Act makes it unlawful for any person to transport or to deliver for transportation in interstate commerce agricultural seeds with untruthful labels. Seeds are the keystone to the agricultural and horticultural industry, an industry which is vital to the life and prosperity of the country. The responsibility resting on the shoulders of those who grow and distribute these essential articles is therefore a heavy one. If agriculture is to succeed, crop seeds must be of suitable stocks or strains, have a high vitality and be relatively free from disease and weed seeds. Seed testing is an art and the farmer must depend for the purity of his seeds on the tests made by others as he is not trained in this art and has not the facilities. The basic philosophy of the Federal Seed Act is to inform the user of what he is buying and to protect him against adulteration. The burden of knowing what is for sale and telling the truth about it is placed on the distributor, under the Act because he is presumed to have the better facilities for ascertaining the facts. (H. R. Rep. No. 538, 76th Cong. 1st Sess., pp. 2 and 3). The Act must be construed and applied in the light of its purpose. United States v. Dotterweich, 320 U.S. 277, 280, 64 S.Ct. 134, 88 L.Ed. 48.

The persons who made the analyses of samples sent to the Alabama State Laboratory and to the Federal Seed Laboratory were not called as witnesses. An associate seed technologist in charge of the administration of the Federal Seed Act and the Custodian of the records in the Federal State Seed Laboratory at Montgomery, Alabama, made a copy of the report of the analyst on the sample taken from the lespedeza shipped to the Atlanta Seed Company and put the report in evidence, which was the only evidence in the record as to the analysis of this shipment. The analyses of all the other seeds in question were testified to by the Chief Seed Analyst for the State of Alabama, who introduced in evidence the original records of the analyses in his office. This witness testified that he, personally, made an analysis of some of the samples and that all others were made under his supervision and that the reports of the analyses and tests were kept in his custody as the official in charge of the State Laboratory. The record is clear that the samples were taken from the identical shipments of seeds in question and were sent to the laboratories in the usual and ordinary manner and were properly identified.

Petitioner urges that, giving full weight to the rule that an administrative body is not limited by the strict rules as to the admissibility of evidence which prevails in courts, the testimony here in question was incompetent, being clearly hearsay and that its admission deprived petitioner of the right to cross examine the seed analyst, and that to enforce the Administrator's order based on such testimony would deprive petitioner of its property without due process of law in violation of the Fifth Amendment.

Title 7 U.S.C.A. § 1607 authorizes the Administrator of the Federal Seed Act to cooperate with any State or its department agencies in carrying out the provisions of the Act. It will thus be seen that under the plain provisions of the Statute in question it was contemplated that State agencies were to be used in its administration. So, in testing the competency of the questioned evidence, the records of the laboratories of the Federal and State Governments are on an equal footing. A report

of a public official is distinguished from a return of such official in that the latter is typically concerned with something done or observed by that officer, while the report embodies the result of the officer's investigation not originally occurring within his personal knowledge. But a report, if made under due authority is receivable in evidence on the same principle as an official return.

■ Reports which are of a public nature and taken under competent authority to ascertain a matter of public interest are admissible in evidence against all the world. It is not essential to the admission of evidence of this nature that the inquiry should have been made by virtue of some judicial authority and by means of witnesses examined upon oath. It is sufficient if it was made by virtue of competent authority on behalf of the public and on a subject matter of public interest. Wigmore on Evidence, Third Edition, Vol. 5, Sec. 1670.

■ Title 28 U.S.C.A. § 695, makes admissible in the courts of the United States, any memoranda or the record of any act, transaction, occurrence or event, if it shall appear that it was made in the regular course of business and that it was the regular course of such business to make such memoranda or record. It has been said that it was the intention of Congress in enacting this section to bring decisions of all Federal courts into line with the modern rule that it is sufficient to show that the entry is contained in a book of regular entries maintained in the establishment without producing the particular person who made the entry and having him identified. Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719. While the statute to which reference is made relates solely to the admissibility of evidence in the courts, we know of no reason why the principle enunciated should not be applied to proceedings before administrative tribunals since they need no statutory authority to apply it. The rule is a common-sense method of getting information and presents little danger of injustice.

■ The records in question were of a public character, made and kept for a public purpose and they come within the rule which admits in evidence records kept by persons in public office in which they are required by the nature of their office to write down particular transactions occurring in the course of their public duties or under their personal supervision. Evanston v. Gunn, 99 U.S. 660, 666, 25 L.Ed. 306. The evidence was admissible; its weight was for the Administrator.

■ Petitioner included by mistake a bag of screenings of lespedeza seed in a shipment to an Alabama customer. Samples were taken from this bag and analyzed, the analysis showing a dodder seed content of 18,900 per pound. The examiner rejected the analysis of this sample as evidence. The Administrator, in his findings of fact, included it. Petitioner urges on us that this makes the order of the Administrator defective. Admitting, for the purpose of the case, that this evidence was erroneously considered by the Administrator, it could not affect either way the legal significance of the order. The record furnishes legal support for the findings of fact of the Administrator aside from this particular bag.

■ The cease and desist order of the Administrator is made applicable to all shipments of petitioner in interstate commerce. Petitioner asks that it be modified and made applicable to shipments only into the States of Alabama and Georgia. While it is true the complaint and findings of fact relate exclusively to shipments into the two states mentioned, we are of the opinion that under the terms of the statute, the Administrator was free to issue a cease and desist order applicable to all shipments made by petitioner in interstate commerce.

When a distributor of seeds has violated the provisions of the Federal Seed Act in a particular manner, the Administrator may issue a cease and desist order from further violations of the Act by the means theretofore employed. The practice sought to be restrained generally has a close resemblance to that which the distributor has followed in some states and which he may follow in others and there are reasonable grounds for believing that unless restrained there is a likelihood of future transgressions. National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930.

The order of the Administrator is affirmed.