**RITE FABRICS, INC., Plaintiff,**

v.

**STAFFORD–HIGGINS CO., INC.,**
**Defendant.**

**STAFFORD–HIGGINS INDUSTRIES,**
**INC., Plaintiff,**

v.

**GAYTONE FABRICS, INC.,**
**Defendant.**

**Nos. 68 Civ. 2646, 68 Civ. 4482.**

United States District Court,
S. D. New York.

Sept. 25, 1973.

As Amended Oct. 5, 1973.

1

Weil, Gotshal & Manges, New York City, for Rite Fabrics, Inc. and Gaytone Fabrics, Inc.; Nathan Cooper, New York City, Paul H. Dawes of counsel.

Otterbourg, Steindler, Houston & Rosen, New York City, for Stafford-Higgins Industries, Inc.; Arthur A. Greenfield, Martin D. Haber, New York City, of counsel.

## OPINIONS, FINDINGS OF FACT and CONCLUSIONS OF LAW

LEVET, District Judge.

This action was brought by plaintiff for an amount due on a contract for the sale of fabric which was sold, delivered and then subsequently used by defendant. Defendant has counterclaimed for the amount of damages it has sustained due to an alleged breach of warranty of merchantability and fitness for a particular use. Defendant has also impleaded a third-party defendant which defendant alleges is also liable for the breach.

This case was tried to the court without a jury. Substantial issues of fact and law were involved in this action. The court has carefully examined the proof submitted and after extensive consideration has decided the issues of law as hereinafter enunciated.

After hearing the testimony of the parties, examining the exhibits and the Proposed Findings of Fact and Conclusions of Law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. This court has jurisdiction over the subject matter and parties of this action. 28 U.S.C.A. § 1332.

2. Plaintiff, Rite Fabrics, Inc. ("Rite Fabrics"), is, and at the time of the commencement of this action was, a corporation organized under the laws of the State of New York, maintaining its principal place of business at 135 West 37 Street, New York, New York. Plaintiff is engaged in the business of converting and jobbing textiles; as such it contracts with dyers and printers of textiles to change cloth material from a greige state to a finished state and subsequently sells the finished fabric to manufacturers of garments. (Plaintiff's post-trial proposed findings of fact No. 1.)

3. Defendant, Stafford-Higgins Industries, Inc. ("Stafford-Higgins"), is, and at all times relevant to this action was, a Connecticut corporation having its principal place of business and office at Willard Road, Norwalk, Connecticut. Stafford-Higgins has manufactured only women's swimwear since 1949. (120, 121.)[1]

4. Third-party defendant, Gaytone Fabrics, Inc., is a New York corporation with its office and principal place of business at the time of this action at 135 West 37 Street, New York, New York.

5. Leo Levine, Inc. ("Levine") is a selling agent for Stafford-Higgins and

---

1. Numbers in parentheses, unless otherwise specified, refer to the stenographic minutes of the trial before this court on March 26, 27, 28, 29, April 26 and June 5, 1973.

sold textiles for Stafford-Higgins at all times relevant to this action. (22.) Levine also has advised Stafford-Higgins with respect to goods and styles which Stafford-Higgins may use in its production of women's swimwear, and did so at all times relevant to this action. (23.)

6. At or about late June or early July 1967, Levine, as agent for Stafford-Higgins placed an order with Rite Fabrics for a sample purchase of ten yards of an acetate and rayon tricot fabric which had an "animal print" on it. (24, 26, 27; Ex. NN.) This order was placed through a salesman for Rite Fabrics named Harry Feinberg ("Feinberg"). (24.) Levine also ordered five yards of a voile fabric as a sample to be used in conjunction with the acetate and rayon tricot to make three-piece women's swim suit sets. (27.)

7. Feinberg was acquainted with Stafford-Higgins as a manufacturer of women's swimwear and had dealt with it on prior occasions. (26.) Feinberg also knew that Stafford-Higgins was then designing a woman's swim suit set with the sample fabric which Levine had ordered and received from Rite Fabrics. (27.)

8. The aforesaid sample fabric ordered by Levine from Rite Fabrics through Feinberg was subsequently delivered to Stafford-Higgins and was received by Clifford Holcomb, the purchasing agent for Stafford-Higgins, in Norwalk, Connecticut. (46, 49, 54; Exs. NN, OO.) This sample fabric was subsequently cut and sample women's swimwear garments were made out of it in and around July 1967. (55.)

9. Holcomb, acting for Stafford-Higgins, subsequently ordered another sample of the heretofore-mentioned fabric (Finding of Fact 8) from Rite Fabrics. That order was received by Stafford-Higgins at or about the end of July 1967 in Norwalk, Connecticut. (66; Ex. PP. Stafford-Higgins made this fabric into sample women's swimwear at or about early August 1967. (67.)

10. At or about late August or early September 1967, Holcomb for Stafford-Higgins placed an order with plaintiff, Rite Fabrics, for 2,675 yards of the voile and 2,400 years of the acetate which Stafford-Higgins used to make sample swimwear. These orders were placed by Holcomb for Stafford-Higgins by telephone to Rite Fabrics. (58, 68, 689, 690) and were subsequently confirmed by Stafford-Higgins in writing. (Ex. A3.) The form of that order contained the following conspicuous wording in large capital letters: "THESE GOODS TO BE USED FOR SWIMWEAR. ALL COLORS, PRINTS AND BONDING PROCESSES MUST MEET SWIMWEAR SPECIFICATIONS." (Ex. A3; Appendix A.)

On the reverse side of that order form were the following paragraphs:

"Merchandise will conform to accepted samples or to Stafford-Higgins Co., Inc. specifications, whichever the case may be or both.

"If terms on this order do not appear on or agree with Seller's invoice as rendered, Seller agrees that Stafford-Higgins Co., Inc. may change invoice to conform to this order and make payment accordingly."

Plaintiff never objected to any of these terms either orally, in writing or otherwise.

11. In and about October 1967, Feinberg, Rite Fabrics' salesman, telephoned Holcomb and suggested another acetate to be used by Stafford-Higgins to replace the acetate Stafford-Higgins had been buying up to that date. (77; Exs. A3, B.) That new fabric was made of a heavier weight and thus could be used for the bikini bottom of the three-piece outfit, eliminating the necessity of attaching a fabric lining. Holcomb inquired of Feinberg as to whether the superknit would meet the swimwear specifications as stated on the Stafford-Higgins' order form. (Ex. A3.) Feinberg thereupon assured Holcomb that the superknit would meet the swimwear specifications as stated on defendant Stafford-Higgins' order form. (83.) Holcomb subsequently received a sample of

the new superknit which he found to be as Feinberg had previously described. (78, 83, 84, 85; Exs. RR, SS.)

12. Stafford-Higgins subsequently placed eleven more orders with Rite Fabrics during the period October 1967 and April 1968. Each of these Stafford-Higgins' order forms stated thereon "3411 AS HAD" (Exs. A3–L), thus incorporating by reference the Stafford-Higgins' order form of Exhibit A3.[2]

The invoices issued by Rite Fabrics delivered with the goods stated in non-conspicuous small print:[3] "No refunds after 5 days. Check goods before cutting." (Exs. 2–13; Appendix B.) There was no reference to warranties or disclaimer of fitness for use on any part of the Rite-Fabric invoice, either directly or by incorporation by reference.

Rite Fabrics and Stafford-Higgins both stipulated to the purchase and delivery of the goods mentioned above. (5, 87, 88.)

13. On or about and between August 14, 1967 and April 22, 1968 Rite Fabrics sold and delivered to Stafford-Higgins 2,404 yards of bonded acetate jersey; 21,458 yards of superknit acetate jersey and 55,760 yards of dacron-cotton-voile, all in Rite Fabrics' animal print pattern, style 3411. The total price for this material was $60,822.70, of which Stafford-Higgins paid $17,314.35, leaving a balance due in the amount of $43,508.35. (3–5; Exs. 2–13.) This fabric so delivered was made up in different job or dye lots. (Court Ex. 1.)[4]

14. Stafford-Higgins subsequently manufactured 3,525$^{11}\!/_{12}$ dozen three-piece women's swim outfits at a cost of $48.66 per dozen from the said material ordered and delivered from Rite Fabrics. (Exs. 39, 40, GGG.) Of the 3,515$^{11}\!/_{12}$ suits manufactured, Stafford-Higgins sold and delivered to its customers 2,835$^{11}\!/_{12}$ dozen three-piece women's swim outfits. (Exs. BBB, CCC, GGG.) 680½ dozen swim outfits were unsaleable. Stafford-Higgins subsequently issued $34,921.86 in credits to its customers for returned bathing suits. (Exs. FFF, DDD, GGG.) Stafford-Higgins expended $33,113.13 in the production of the 680½ dozen unsold swimsuits. (542; Ex. UU.)

15. Stafford-Higgins notified Rite Fabrics on May 4, 1968 that it had received a substantial number of complaints with respect to the colorfastness quality of the aforementioned bathing suits sold.

16. The print on the aforesaid fabric ordered by Stafford-Higgins from Rite-Fabrics had been placed on the fabric by

2. This arrangement of multiple purchases is considered in Section 2–612 U.C.C. (McKinney's 1964):

"'Installment Contract'; Breach

"(1) An 'installment contract' is one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause 'each delivery is a separate contract' or its equivalent.

"(2) The buyer may reject any installment which is non-conforming if the non-conformity substantially impairs the value of that installment and cannot be cured or if the non-conformity is a defect in the required documents; but if the non-conformity does not fall within subsection (3) and the seller gives adequate assurance of its cure the buyer must accept that installment.

"(3) Whenever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole. But the aggrieved party reinstates the contract if he accepts a non-conforming installment without seasonably notifying of cancellation or if he brings an action with respect only to past installments or demands performance as to future installments."

3. "Conspicuous": "A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A print heading is conspicuous. Language or other contrasting type or color. * * * Whether a term or clause is 'conspicuous' or not is for decision by the court." § 1–201(10) U.C.C. (McKinney's 1964).

4. I have made these letters part of the record, Appendix C.

Rite Fabrics by a process called "pigment printing." Pigment is a powder combined with a resin which is attached to the surface of the fabric by heat curing, thereby causing the pigment to bind to the surface of the fabric. (635, 636.)

17. A random sample of new and used bikini parts of the three-piece swim outfit was tested for colorfastness. (Exs. ZZ, AAA.) These suits were subject to A.A.T.C.C. colorfastness tests, which were compared to the minimum performance requirements as promulgated by the American National Standards Institute. (178, 632; Exs. ZZ, AAA, 46.) A significant degree of varying percentages of the tested garments were found to be defective in that they failed to meet the minimum performance standards for colorfastness. (Exs. ZZ, AAA; 178, 632.) The irregular colorfastness was due to defective printing of the fabric. Additional curing of some of the garments improved their colorfastness. There was no practical method of determining which of the unsold or returned merchandise could be separated into satisfactory and unsatisfactory goods. (Ex. ZZ.)

18. Defendant Stafford-Higgins has sustained damages in the net amount of $24,526.64, computed as follows:

Credits issued to customers (including profits lost and costs of production for returns and allowances (Finding of Fact 14) ......$34,921.86

Cost of production of .680½ dozen unsalesable swim suits (Finding of Fact 14) ...................$33,113.13

Gross damages sustained by Stafford-Higgins from defective fabric .........$68,034.99

LESS amount due on contract price of fabric received and retained by Stafford-Higgins used in manufacturing swimwear (Finding of Fact 13) ...............$43,508.35

Net amount of damages sustained by Stafford-Higgins ............$24,526.64

5. This theory reflects one of the basic adjustments common-law lawyers will have to make in working with Section 2–207, namely that an acceptance can also amount to a counter-offer. See U.C.C. Service Vol. 3, § 3.04 [1] (Mathew-Bender 1966).

## DISCUSSION

## OFFER AND ACCEPTANCE

Plaintiff argues that its invoice and shipment of the goods ordered by defendant Stafford-Higgins was both an acceptance to sell goods to Stafford-Higgins *and* a counteroffer to sell the goods to Stafford-Higgins;[5] that Stafford-Higgins accepted and under this theory is entitled to recover the contract price. The plaintiff bases its argument upon Section 2–207 of the Uniform Commercial Code[6] and upon Roto-Lith, Ltd. v. F. P. Bartlett Co., 297 F.2d 497 (1st Cir. 1962), one of the first cases interpreting Section 2–207 of the U.C.C. (Plaintiff's post-trial brief, p. 21.)

Hence, the initial determination I must make is what posture the invoice and shipment of the goods takes, that is, whether such shipment was an acceptance with additional terms or a counter offer which Stafford-Higgins accepted by the cutting of the fabric and subsequent manufacturing of the women's swimwear in light of Section 2–207 and the interpreting case law.

An invoice, in and of itself, is only a detail statement of the nature, quantity and the cost or price of the goods included in the invoice. This was the law in New York prior to the adoption of the U.C.C. and is still the law in New York. Tanenbaum Textile Co. v. Schlanger, 287 N.Y. 400, 40 N.E.2d 225 (1942); Flamingo Lingerie v. Camay Fabrics, N.Y.L.J. Friday, March 22, 1968, p. 16, col. 6.

Under common law rule, if the terms of a purported acceptance varies the terms of the offer, even as to trivial detail, it operates as a counter offer and thereby a rejection of the offer. "Because the common law rule requiring offering and acceptance to match precisely

6. Both parties have presented their arguments under the N.Y.U.C.C. which I have also determined applies. However, the determination would be the same under the Connecticut U.C.C.

was frequently applied with strictness, making even apparently insignificant variations between offer and acceptance sufficient to negate the existence of a contract, business arrangements which both parties had assumed to be binding were vulnerable to avoidance with impunity." 76 Harv.L.Rev. 1481, 1482 (1963).

However, Section 2–207 of the U.C.C. substantially changes the common law rule. Section 2–207 of the U.C.C. states:

"(1) A *definite* and *seasonable expression of acceptance* or a *written confirmation which is sent within a reasonable time operates as an acceptance even though* it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

"(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

"(a) the offer *expressly limits* acceptance to the terms of the offer;

"(b) they materially alter it;

"(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

"(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale, although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provision of this Act." (Emphasis supplied.)

Section 2–207 is an indication of intent of the draftsmen of the code to modify the unrealistic technical rules of the common law of sales and resolve the "battle of the forms," by substituting a set of rules and legal principles conforming to the practices and expectations of modern businessmen. Practice Commentary to Section 2–207 U.C.C. (McKinney's 1964).

One of the first cases which attempted to interpret Section 2–207 was *Roto-Lith,* supra, upon which plaintiff relies.

In *Roto-Lith,* supra, the buyer requested the seller to ship certain goods. The seller subsequently shipped the goods with an acknowledgement of the order and a shipping invoice, both of which had wording specifically excluding all warranties as to fitness for use with respect to the goods ordered and delivered. The buyer was aware of such wording on the acknowledgement and invoice.

The First Circuit determined that the additional terms on the acknowledgement and invoice were so materially different from the purchase order that the shipment was a counter offer and not an acceptance with additional terms. The acknowledgements and invoices stated:

"All goods sold without warranties, express or implied, and subject to the terms on reverse side.

"1. Due to the variable conditions under which these goods may be transported, stored, handled or used, Seller hereby expressly excludes any and all warranties, guaranties, or representations whatsoever. Buyer assumes risk for results obtained from use of these goods, whether used alone or in combination with other products. Seller's liability hereunder shall be limited to the replacement of any goods that materially differ from Seller's sample order on the basis of which the order for such goods was made.

"2. This acknowledgement contains all of the terms of this purchase and sale. No one except a duly authorized

officer of Seller may execute or modify contracts. Payment may be made only at offices of the Seller. If these terms are not acceptable, Buyer must so notify Seller at once." (At 499 of 297 F.2d.)

The First Circuit in its discussion of Section 2–207 in *Roto-Lith,* supra, noted that such exculpatory statements made on the acknowledgement and invoice "Materially Altered" [7] the agreement. The court went on to note that while Section 2–207 did contemplate additional terms, including those that materially altered an agreement, the argument proposed by the plaintiff-buyer "exaggerates the freedom which this section affords an offeror to ignore a reply from an offeree that does not in terms coincide with the original offer." (At 499.) The court further commented that because the terms of the acknowledgement and invoice were of such a nature that there could be no other way to interpret them except to state, in a paraphrase of section 2–207, that there could only be an "acceptance * * * expressly * * * conditional on assent to the additional * * * terms." (At 500 (Section 2–207(1) U.C.C.).)

The First Circuit's decision in *Roto-Lith* has been widely criticized.

The most forceful factor in controverting the court's construction of Section 2–207 lies in the very language of the provision. Section 2–207 states that a "definite and seasonable expression of acceptance" operates as an acceptance even though it includes different or additional terms which at common law would have given rise to a *counter offer* and thus operate as a rejection. (Commentary to U.C.C. Section 2–207; see also Contracts, Calimari and Perrillo,

West, 1970.) The Code requires, however, an "express" declaration that the acceptance is conditional upon the offeror's assent to the new terms. (Section 2–207 U.C.C.)

In *Roto-Lith,* supra, however, the court found that there was no definite and seasonable expression of acceptance. Instead, the First Circuit determined that the delivery of the goods with the acknowledgement and invoice was not an acceptance with additional terms but a counter offer which the offeror was in a position to accept or reject. Since the purchaser knew of the terms of the agreement and invoices, there being no subsequent rejection, "it became bound." (At 500.)

■ What constitutes a "definite and seasonable expression of acceptance" is somewhat cloudy under the Code, and whether the acknowledgement form of the seller in *Roto-Lith* would otherwise have qualified cannot be learned from the decision. In general, it may be concluded that if the face of an acknowledged form repeats the terms of the written order there is a "definite and seasonable expression of acceptance." U.C.C. Service, pp. 3–34 (Mathew-Bender 1966).

The First Circuit did not discuss in *Roto-Lith* subdivision (3) of Section 2–207, what would have generated a conclusion that the purchaser should have prevailed.

Under subdivision 3, when the contract arises through the conduct of the parties, the terms of the contract are the terms of the exchanged writings to the extent they are consistent, "together with any supplementary terms incorporated under any other provision of this act." Section 2–207(3) U.C.C. (Mc-

---

7. The official Comment to Section 2–207 of the Code notes that "Examples of typical clauses which would normally 'materially alter' the contract and so result in surprise or hardship if incorporated without express awareness by the other party are: a clause negating such standard warranties as that of merchantability or fitness for a particular purpose in which either warranty normally attaches; * * * a clause requiring that complaints be made in a time materially shorter than customary or reasonable." Comment (4), Section 2–207 U.C.C. (McKinney's 1964).

Kinney's 1964). Therefore, in *Roto-Lith,* since there was a conflict as to the warranty provision, the warranty provision of the Code which would favor the purchaser should have become part of the contract. Comment 6, Section 2–207 U.C.C. (McKinney's 1964).

To be noted at this point is the fact that on the back side of defendant's order form in the present case there was a clause which provided for the changing of any terms presented by plaintiff-seller on its acknowledgement or invoice, to which plaintiff-seller never objected. (Finding of Fact 10.)

In a recent district court decision, Greenspun v. American Adhesives, Inc., 320 F.Supp. 442 (E.D.Pa.1970), the court denied a motion for summary judgment for the defendant-manufacturer in a breach of warranty action. In that case defendant delivered to plaintiff drums of adhesives which had the following label affixed to the outside:

"WARRANTIES: Since we have no control over the conditions under which these goods are transported or under which the purchaser stores, handles, or uses these goods, we make no warranty either express or implied with respect to these goods or their fitness for any purpose or the results to be obtained from their use. No representative of ours has authority to waive or change this provision, which applies to all sales. IF THE PURCHASER DOES NOT ACCEPT THE GOODS ON THESE TERMS, THEY ARE TO BE RETURNED AT ONCE, UNOPENED." (At 443.)

The adhesives were subsequently used by plaintiff and were subsequently found to be defective. In denying defendant's motion, and without referring to Section 2–207 U.C.C. or the *Roto-Lith* decision, the court found that such a label affixed to the drums of adhesives was not a conspicuous notification, significant enough to permit such to be covered by Section 2–316, thereby excluding the warranties.

Section 2–316(2) states:

"Subject to subsection (3) to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in the case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous."

The wording used by defendant in *Greenspun,* supra, "If the purchaser does not accept the goods on these terms, they are to be returned at once, unopened," (p. 443) can certainly be more reasonably construed as a conditional acceptance than the wording used in the *Roto-Lith* case as stated by the First Circuit. However, if *Roto-Lith* had been followed, the motion would have been granted.

An examination of the present plaintiff's shipping invoice does not present such stringent language as was present in both the *Roto-Lith* or *Greenspun* cases, supra. Neither was it conspicuous as defined by the U.C.C. (Finding of Fact 12.)

Consequently there is significant statutory and case law basis to reject plaintiff's argument.

## EXPRESS WARRANTIES

Section 2–313 provides that there need not be any specific mention of a warranty for an express warranty to become part of an agreement.

"(2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."

## WARRANTY EXCLUSION AND MODIFICATION

Here, the seller's invoice has no wording to the effect that any warranties are to be excluded or modified. (Finding of Fact 12.) Nor was there any evidence produced at trial by plaintiff which would lead to a conclusion or inference that any warranties had been disclaimed. On the other hand, there was testimony from which an expressed warranty of fitness for use was established. (83; Ex. A3.)

Section 2–316 U.C.C. in its relevant part requires that:

"(2) * * * to exclude or modify the implied warranty of merchantability or any part of it the language must *mention merchantability* and in case of a writing *must be conspicuous*, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'" (Emphasis supplied.)

Two additional relevant sections of 2–316 go on to state:

"(3)(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty. (b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired * * * there is no implied warranty with regard to defects which an *examination ought in*

*the circumstances* to have revealed to him." (Emphasis supplied.)

■■ The official comment to the Code notes specifically that while there can be a disclaimer of merchantability, such a disclaimer must mention merchantability and where it is written it must be conspicuous. Implied warranties of fitness for a particular purpose may also be disclaimed by the use of general language, but, again, it must be in *writing and conspicuous*. Official Comments 3, 4, § 2–316 U.C.C. (McKinney's 1964).

## SALE BY SAMPLE

An additional section of the U.C.C. provides for a sale by sample or model. Section 2–313 notes that an express warranty by the seller of goods is created where a sample or model "is made part of the basis of the bargain * * * that the whole of the goods shall conform to the sample or model." The official commentary on the Code states: "this section includes both a 'sample' actually drawn from the bulk of goods which is the subject matter of the sale, *and* a 'model' which is offered for inspection when the subject matter is not at hand and which *has not* been drawn from the bulk of the goods."

■ Where there is a sale by sample it must appear that such sample was treated by the parties involved as the standard of quality, and that their dealing were in reference to the sample with the understanding that the bulk was to be like the sample.[8] A & S Henry & Co. v. Talcott, 175 N.Y. 385, 67 N.E. 617 (1903). If a sample of the merchandise is offered, however, and it is modified on the buyer's initiative, the mercantile presumption that it is a literal description of the subject matter is weaker and

---

8. In case of sale by sample, there is an expressed warranty that the bulk shall correspond with sample in quality, placing upon seller the burden of demonstrating that goods subsequently shipped actually matched sample exhibited, Alper Blouse Co. v. E. E. Connor & Co., 2 N.Y.2d 281, 159 N.Y.S.2d 481, 140 N.E.2d 358 (1957), which plaintiff has admitted cannot be done. (Finding of Fact 13; Appendix C.)

thus impairs the particular feature of the model. (See commentary to Section 2–313 U.C.C.) In this instant controversy the modification was initiated not by the buyer but by the seller. (Finding of Fact 11.)

The Second Circuit, in applying Personal Property Law § 96, the forerunner of Section 2–313, stated:

"The goods tendered are either merchantable or unmerchantable, and if they be unmerchantable, it is not a delivery within the requirements of the contract." In re A. W. Cowen & Bros., 11 F.2d 692, 694 (2d Cir. 1926).

Where "the sale [is] one by sample," and "the representative of the bankrupt when the contract was made, was furnished with samples from which he made selections, and the [seller] was informed that the merchandise was to be used for" a particular purpose, no "custom or usage that might exist change[s] the character of the obligations of the parties as contracted." Ibid.

The court further stated:

"Where the contract was made, provides that, where the buyer explains to the seller the particular purpose for which the goods are required, and it appears that the buyer relies upon the seller's skill and judgment, there is an implied warranty that the goods shall be reasonably fit for such purpose. Further that where goods are bought by description from the seller, who deals in goods of that description, there is an implied warranty that the goods shall be of merchantable quality. Section 97 of the same law provides that there is an implied warranty that the bulk shall correspond with the sample in quality, and that the seller of goods warrants by implication that the goods shall be free from any defects rendering them unmerchantable, which would not be apparent on reasonable examination of the sample.[9] Ibid. at 694.

See also Alper Blouse Co. v. E. E. Connor & Co., 2 N.Y.2d 281, 159 N.Y.S.2d 481, 140 N.E.2d 358 (1957).

## SAMPLES FOR TESTING

Where a sample is taken, tested and subsequently introduced into evidence, the requirement is that the mass should be substantially uniform with reference to the quality in question and that the sample portion should be of such a nature as to be fairly representative. Otoe Co. Bank v. Delany, 88 F.2d 238 (8th Cir. 1937); Wigmore, Vol. II, 3rd Ed., p. 421, § 439 (1940).

In a later case, E. K. Hardison Seed Co. v. Jones, 149 F.2d 252 (6th Cir. 1945), the Court of Appeals also permitted the introduction of samples to show quality or condition of an entire lot of see. The court stated:

"Human experience has taught us that one thing concurrently may be associated with another. In other words, the presence of smoke indicates the presence concurrently of fire. Thus it is that samples are receivable in evidence to show the quality or condition of the entire lot or mass from which they were taken. The prerequisites necessary to the admission in evidence of samples are that the mass should be substantially uniform with reference to the quality in question and that the sample portion should be of such nature as to be fairly representative." (At p. 256.)

The samples submitted by defendant comply with the criteria as above stated.

## DAMAGES

The U.C.C. provides for several procedural steps to be taken by a buyer to protect his rights with respect to damages on a breach of warranty.

---

9. The implied warranty that the goods shall be reasonably fit for the intended purpose is now an expressed warranty. Section 2–313 (1)(a) U.C.C.

Section 2–607 provides that prompt notification to the seller is required where the buyer has accepted goods tendered and subsequently finds them defective. The section specifically states in its relevant parts:

"(3) Where a tender has been accepted

"(a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; * * *

"(4) The burden is on the buyer to establish any breach with respect to the goods accepted."

The official commentary to this section notes that there need not be any clear statement of the objections but "merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." (Comment 4.)

"The notification which saves the buyer's rights under this article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation." (Comment 4.)

Once the buyer has notified the seller of the defect, additional provisions within the Code relating to damages are triggered. Specifically, Section 2–714 provides:

"(1) Where the buyer has accepted goods and given notification (subsection (3) of Section 2–607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach *as determined in any manner which is reasonable.*

"(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, *unless special circumstances show proximate damages of a different amount.*

"(3) In a proper case any incidental and consequential damages under the next section may also be recovered. (Emphasis supplied.)

Additionally, Section 2–717 permits the buyer to deduct from the purchase price all or any part of the damages, upon proper notice to the seller that it is the buyer's intention to do such.

Section 2–717 reads as follows:

"The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract."

Moreover, the Code provides for incidental and consequential damages in Section 2–715 where there has been a breach. This section provides as follows:

"(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"(2) Consequential damages resulting from the seller's breach include

"(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

"(b) injury to person or property proximately resulting from any breach of warranty."

In addition to the Code provisions relating to damages, the courts are giving

considerable leeway in arriving at the amount of damages. This rule has been widely applied in a number of situations and while the courts are not permitted to determine damages on conjecture or speculation, there is wide latitude once there is the determination that there are damages.

"The Supreme Court and this Court have stated on a number of occasions that, once the fact of damages has been established, the courts are allowed considerable leeway in arriving at the amount of damages." Clements Auto Company v. Service Bureau Corporation, 444 F.2d 169, 190 (8th Cir. 1971).

The court in *Clements Auto Company* was specifically referring to a Supreme Court decision, Eastman Kodak Company of New York v. Southern Photo Materials Company, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1926), wherein the court stated:

"Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate." (At 379, 47 S.Ct. at 405.)

In addition, while the burden of proof of damages still rests with the wronged party, by a fair preponderance of the evidence "such proof need not be direct, but may, instead be circumstantial." Locklin v. Day-Glo Color Corp., 429 F.2d 873, 879 (7th Cir. 1970). See also Keough v. Chicago & N. W. Ry., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). This includes estimates based upon assumptions, provided that the assumptions rest upon an adequate base. Locklin v. Day-Glo, supra; Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906 (2d Cir.), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L. Ed.2d 85 (1962).

The amount of damages, however, is restricted, as was pointed out in Western Oil & Fuel Company v. Kemp, 245 F.2d 633 (8th Cir. 1957). "A party recovering damages for breach of contract should not be better off because of the breach than he would have been had there been no breach. He is entitled to recover ' * * * such damages as are the natural and proximate consequences of the wrongful act of the defendant.' " (At 644.)

The New York Civil Practice Laws and Rules provide in Section 5001 for interest upon a sum awarded where there has been a breach of performance of a contract and that such interest award is in the court's discretion. Section 5001(a) C.P.L.R. (McKinney's 1964). Subdivision (b) of Section 5001 provides in its relevant part: "Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date."

## THIRD PARTY ACTION

Defendant Stafford-Higgins has brought the third party action against Gay-Tone Fabrics, Inc. on the legal theory that Gay-Tone is liable for the defective goods sold to Stafford-Higgins by Rite Fabrics. The authority for its position as presented is Goldberg v. Kollsman Instrument Corporation, 12 N.Y.2d 432, 240 N.Y.S.2d 592, 191 N.E.2d 81 (1963) and Randy Knitwear Inc. v. American Cyanamid Company, 11 N.Y. 2d 5, 226 N.Y.S.2d 363, 181 N.E.2d 399 (1962).

While the above-mentioned cases do admittedly dispense with the need for privity in contract for breach of warranty, the present action does not factually support defendant's position. In both *Goldberg* and *Randy Knitwear* the proof was clear that defendants were actually the parties who manufactured and guaranteed the parts or materials. In the instant action there was limited proof on the manufacturer of the fabric, only

that both plaintiff and third-party defendant shared the same premises and some of the same employees. I am not convinced that those factors alone would, without further proof, bring this instant controversy within the ruins of the "citadel of privity," as has been determined in *Goldberg* and *Randy Knitwear*.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the persons and the subject matter of this action.

2. Defendant Stafford-Higgins has proved by a fair preponderance of the credible evidence that plaintiff Rite Fabrics made an express warranty of merchantability and fitness for a particular use of the fabric purchased by Stafford-Higgins from Rite Fabrics and said warranty was breached.

3. Defendant Stafford-Higgins has proved by a fair preponderance of the credible evidence that it relied on the representations made by Rite Fabrics with respect to the warranty of merchantability and fitness for a particular use.

4. Plaintiff has failed to prove by a fair preponderance of the credible evidence that it disclaimed any warranties whatsoever with respect to the fabric it sold to Stafford-Higgins at issue in this controversy.

5. Stafford-Higgins has proved by a fair preponderance of the credible evidence that it has suffered damages in the net amount of $24,526.64 due to the breach of the warranty of merchantability of fitness for a particular use by Rite Fabrics, as follows:

| | |
|---|---|
| Credits issued to customers (including profits lost and costs of production for returns and allowances (Finding of Fact 14) | $34,921.86 |
| Cost of production of 680½ dozen unsalesable swim suits (Finding of Fact 14) | $33,113.13 |
| Gross damages sustained by Stafford-Higgins from defective fabric | $68,034.99 |
| LESS amount due on contract price of fabric received and retained by Stafford-Higgins used in manufacturing swimwear (Finding of Fact 13) | $43,508.35 |
| Net amount of damages sustained by Stafford-Higgins | $24,526.64 |

6. Defendant Stafford-Higgins is entitled to interest on the net amount of damages from June 1, 1968.

7. Defendant Stafford-Higgins has failed to prove by a fair preponderance of the credible evidence that third-party defendant Gaytone Fabrics, Inc. is liable for the breach of warranty for fitness for a particular purpose and the damages therefrom.

8. Stafford-Higgins is entitled to a total net judgment of $24,526.64, plus interest, with costs, against plaintiff Rite Fabrics.

9. Gaytone Fabrics, Inc., defendant in the action of Stafford-Higgins Industries, Inc. v. Gaytone Fabrics, Inc., 68 Civil 4482, is entitled to costs against Stafford-Higgins.

Settle judgment on notice pursuant hereto.

# APPENDIX A

STAFFORD HIGGINS INDUSTRIES
WILLARD ROAD · NORWALK, CONNECTICUT 06851 · (203) 846-1666

No. **000196**

AUG. 14, 1967

THIS ORDER NUMBER MUST APPEAR ON ALL BILL OF LADINGS, INVOICES, AND PACKAGES. DO NOT INVOICE IN DUPLICATE.

TO
RITE FABRICS CORP.
135 WEST 37TH ST.
NEW YORK, N.Y. 10018
ATTN: HARRY FIENBERG

SHIP TO
~~WILL ADVISE~~
*House*

| TERMS: ANTICIPATION ALLOWED | F.O.B. OUR PLANT | SHIP VIA: BEST WAY | DELIVERY NO LATER THAN A.S.A.P. |
|---|---|---|---|

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL COST |
|---|---|---|---|
| 2675 YARDS- | STYLE #3411 DACRON/COTTON VOILLE. *Rerun 2691 yds.* 44/45" WIDTH | @ .~~65~~¢ PER YD. .62½ | |
| 2400 YDS.- | STYLE #3411 ACETATE TRICOT-THIS PRINT TO BE BONDED TO BLACK ACETATE TRICOT. *Rec'd* 2464½ @ $1.00 PER YD. BONDED. CONFIRMATION OF PHONE ORDER. DO NOT DUPLICATE. THESE GOODS TO BE USED FOR SWIMWEAR. ALL COLORS, PRINTS AND, BONDING PROCESSES MUST MEET SWIMWEAR SPECIFICATIONS. PLEASE ACKNOWLEDGE RECEIPT OF THIS ORDER AND ADVISE YOUR BEST POSSIBLE DELIVERY DATE. <u>MARK FOR STYLE #1151 CUT #1</u> | | |

THIS ORDER PAYABLE TO SELLER DIRECT. FACTORING OR OTHER PAYEE DISALLOWED UNLESS SPECIFIC AUTHORIZATION GIVEN BY PURCHASER.

STAFFORD-HIGGINS CO., INC.
BY _____
SUBJECT TO CONDITIONS ON REVERSE SIDE

TERMS AND DISCOUNTS AS AGREED.
[A8287]

ACCOUNTING

Merchandise will conform to accepted samples or to Stafford-Higgins Co., Inc. specifications, which-ever the case may be, or to both if there are both.

Seller will defend and idemnify Stafford-Higgins Co., Inc. against all claims, actions, liability, damage, loss and expense arising, or alleged to arise, from patent, trade-mark or copyright infringement, from unfair competition, from injury to persons or damage to property due to defects or alleged defects in material or workmanship, or from the failure by the Seller to manufacture, produce, package, label, ship, and, if required, to register all merchandise delivered pursuant to this order in accordance with and in conformity to all applicable State and Federal laws.

If terms on this order do not appear on or agree with Seller's invoice as rendered, Seller agrees that Stafford-Higgins Co., Inc. may change invoice to conform to this order and make payment accordingly.

Acceptance of this order constitutes a quaranty that all merchandise delivered pursuant to this order has been manufactured, produced, packaged, labeled, shipped, and if required, registered in accordance with and in all respects conforms to all applicable State and Federal laws.

Payment of this order will be subject to deducting of any valid claim of Stafford-Higgins Co., Inc. against Seller arising from this or any other transaction.

Delivery must be complete by date specified, after which Stafford-Higgins Co., Inc. reserves the right to refuse and may replace merchandise at it's option. Additional charges incurred due to in-fraction to be charged to Seller.
[A8288]

APPENDIX B

# RITE FABRICS CORP.

135 WEST 37th STREET
NEW YORK, N. Y. 10018
564-7720-1-2-3

SOLD TO *Stafford-Higgins Industries*
*Willard Rd.*
*Norwalk, Conn.*

N⁰ 11335

DATE *8/16/67*

TERMS: *Net 6c days* *10%* VIA *Hemingway* NO. OF PIECES *2 Carton*

SALESMAN

GOODS DELIVERED TO COMMON CARRIERS OR SENT VIA PARCEL POST ARE AT THE RISK OF THE PURCHASER. NO CLAIMS ALLOWED AFTER FIVE DAYS. GOODS MUST BE EXAMINED BEFORE CUTTING. NO ALLOWANCES MADE AFTER MERCHANDISE IS CUT.

| Quality | Piece No. | Yds. | DESCRIPTION | Total Yds. | Price | Amount | TOTAL |
|---------|-----------|------|-------------|------------|-------|--------|-------|
| Carton #1421/679 | | | Brown 3411 Dacron Cotton Twill | | .62½ | | 1681.88 |
| " # 1402 & /06 / Brown | | | 2691 | | | | |
| 65% Dacron | | | | | | | |
| 35% Cotton | | | Order # 000196 | | | | |
| For Style # 1151 Cut #1 | | | | | | | |

PAY ONLY TO
RITE FABRICS CORP.

NO CLAIMS SHALL BE ALLOWED ON
MERCHANDISE WHICH HAS BEEN LAMINATED

Invoice Will Follow
By Mail

[A8289]

---

APPENDIX C

May 23, 1973

Hon. Richard H. Levet
Senior Judge
United States District Court
Southern District of New York
United States Courthouse
New York, New York 10007

    Re: Rite Fabrics v. Stafford-Higgins
        68 Civ. 2646 Stafford-Higgins v.
        Gaytone Fabrics 68 Civ. 4482

Dear Judge Levet:

  This letter is in response to your letter of May 1, 1973.

The record shows that tests were made from more than one lot (whether the word "lots" refers to dye lots or production by Rite Fabrics), (we cannot identify the specific lots).

At page 253 line 14 defendant's Exhibit ZZ for identification was received in evidence. Exhibit ZZ is the U.S. Testing Report. The U.S. Testing Report on the first page shows that:

"Thirty six (36) new bathing sets that had been sampled by random selection from a lot of 1685 dozen in stock by a representative of the US Testing Company, Inc. who visited the

premises of Stafford-Higgins Industries in Norwalk for that purpose."

This exhibit, which is part of the record, shows that a random sample was picked from 47.9% of the total amount of produced bathing suits.

The population from which the random sample was picked is larger than any dye lot or delivered order as shown below. An analysis of Stafford-Higgins' Exhibits A3 through L (which are the orders placed by Stafford-Higgins with Rite Fabrics which were admitted into evidence on pages 16 through 18) and Exhibits M–X (which are Rite's invoices to Stafford, which were admitted into evidence on page 19) and Exhibit Y which are the twenty-four dye orders issued by Gaytone Fabrics to Jersey Dye and Print Company for the fabrics that Stafford bought from Rite, which were admitted into evidence on page 30), show that our tests had to come from more than one lot whether it be dye lot or an amount that Rite produced which it shipped to Stafford.

The total number of yards of acetate fabric which Rite Fabrics shipped to Stafford (this information is found on each of the invoices of Rite Fabrics which are in evidence), and which Stafford used to produce the bikinis which are the subject of this action, was 23,911 ⅔ yards.

The top of the first page of Stafford's Exhibit GGG shows that Stafford produced 3,515 and ¹¹⁄₁₂ dozen bathing suits or 42,191 bathing suits. A little less than ½ yard of acetate was used for each bikini.

A random sample was taken from 20,220 bathing suits. This means that a random sample was taken from some 10,000 yards of material: no single invoice and no single dye order was for 10,000 or more yards.

In fact, the largest "lot" that Rite sent Stafford was 3,901 yards. This is found on invoice 4879 dated March 10, 1968 and is Stafford's Exhibit S1. The largest dye order is order number 10127 dated 4/22/68 and is found in Exhibit Y, the second to last piece of paper and is for 3,042 yards.

It is mathematically impossible for the random sample tested by U.S. Testing to have come from the same "textile lots."

Respectfully,

(s)   Arthur A. Greenfield
Arthur A. Greenfield

AAG:ef

cc: Nathan Cooper, Esq.
Weil, Gotshal & Manges
767 Fifth Avenue
New York, New York 10022

May 29, 1973

Hon. Richard H. Levet

Senior Judge of the U.S.
District Court for the
Southern District of
New York
United States Courthouse
Foley Square
New York, New York 10007

Re: Rite Fabrics v. Stafford-Higgins
68 Civ. 2646 Stafford-Higgins v.
Gaytone Fabrics 68 Civ. 4482

Dear Judge Levet:

In response to your letter of May 1, 1973 requesting a statement from counsel for the adverse parties regarding the possible differentiation in tests of garments which may have been cut from different textile lots, it is our considered opinion, for the reasons mentioned in our adversary's letter to you of May 23, 1973, that is is virtually impossible to determine whether the bathing suit samples tested by Better Fabrics Testing Bureau, Inc., U.S. Testing Company, Inc. and Fabric Research Laboratories, Inc. came from the same job or dye lots. The likelihood is that, by reason of the installment purchases and deliveries, they came from different job or dye lots.

Please accept our apologies for not answering your letter sooner.

Respectfully yours,

WEIL, GOTSHAL & MANGES

By (s) Nathan Cooper
Nathan Cooper

NC:yh
cc: Arthur A. Greenfield, Esq.