Claude CIMINO, et al.

v.

RAYMARK INDUSTRIES, INC., et al.

No. B–86–0456–CA.

United States District Court,
E.D. Texas,
Beaumont Division.

Nov. 12, 1990.

Walter Umphrey, Diane Dwight, Greg Thompson, Ken Bailey, Bob Monk, Brent Coon, Chip Ferguson, Tim Ferguson, Jim Mehaffy, Thomas Thomas, Charles Carver, David Brandom, Frank Lamson, Ronald Plessala, Gerald Eddins, James Morris, Nick Palmarozzi and Paul Ferguson, Umphrey, Eddins & Carver, Wayne Reaud, Glenn Morgan, Chris Quinn, Joe Blanks, Richard Clarkson, Alto V. Watson, III, Reaud, Morgan & Quinn, Beaumont, Tex., Ron Motley, Joe Rice, Jackie Rion, Tim Eble, Motley, Loadholt, Richardson & Poole, Charleston, S.C., Roxie A. Huffman, Orange, Tex., for Claude Cimino, et al.

Elizabeth Thompson, Robert Arredondo, Randa Duncan and Jeffrey Mundy, Butler & Binion, Houston, Tex., for Celotex Corp.

Robert S. Daggett, Gary Fergus, James Miller, Bill Levin and Michael Stanley, Brobeck, Phleger & Harrison, San Francisco, Cal., Lyn Stevens, Weller, Wheelus & Green, Beaumont, Tex., Robert Fanning and Phil Brown, Fanning, Harper & Martinson, Dallas, Tex., for Fibreboard.

Michael Baker, Strong, Pipkin, Nelson & Bissell, Beaumont, Tex., for ACL.

Henry Garrard, John Suthers and Bill Harvard, Blasingame, Burch, Garrard & Bryant, PC, Athens, Ga., for Pittsburgh–Corning.

## OPINION AND ORDER

ROBERT M. PARKER, Chief Judge.

The odyssey of asbestos litigation in the Eastern District of Texas has now entered its third decade. The trek started by Clarence Borel and Claude Tomplait has been marked by aimless wandering through the legal wilderness. The journey has taken its predicted toll. Raymark, Forty–Eight Insulations, Unarco, Standard Asbestos,

Johns–Manville, Eagle–Picher, and now Celotex are bankrupt. Other defendants are clearly in the twilight of their participation. Four hundred and forty-eight members of the class have died waiting for their cases to be heard. The departed companies and plaintiffs have all been victims of a system that has seen a substantial majority of the compensation dollar go to witnesses and lawyers in the form of transaction costs. Transaction costs consumed $.61 of each asbestos-litigation dollar with $.37 going to defendants litigation costs; the plaintiffs receive only $.39 from each litigation dollar. Institute for Civil Justice, *Annual Report*, April 1, 1990–March 31, 1991 (RAND). The remaining parties have also been victimized by the same costs and the inability of the courts to provide a forum to the litigants.

A review of this litigation with the perspective of hindsight reveals many mistakes and missed opportunities by both this Court and the Court of Appeals. In 1981, Forty–Eight Insulations sought to conduct discovery in preparation for asserting a district wide market share determination among the defendants in order to reduce the costs of continuing expensive, individual discovery and trial on the exposure question, and to more accurately establish apportionment of causation among the defendants. Forty–Eight Insulations abandoned its motion because of pressure from co-defendants. In retrospect, this Court could have saved millions of dollars in unnecessary transaction costs by forcing the issue. Also, in 1981 in an attempt to reduce costs by avoiding repetitive identical trials, the Court by way of issue preclusion found asbestos containing products defective and unreasonably dangerous as a matter of law and further precluded plaintiffs from seeking punitive damages. The Court of Appeals in *Hardy v. Johns–Manville Sales Corp.*, 681 F.2d 334 (5th Cir.1982), rejected the approach. Again in retrospect, this Court should have recognized the fact that there was a disparity of appreciation for the magnitude of the problem between the trial court and the Court of Appeals. The disparity resulted from the trial court's daily involvement with asbestos litigation and the Court of Appeals' exposure being limited to infrequent appeals. Instead of blindly following *Hardy* for eight years, this Court should have caused thirty to forty identical appeals to have been processed in order to enhance the awareness level of the Court of Appeals. The defendants' victory in *Hardy* has cost over four hundred million dollars in increased and unnecessary transaction costs and has preserved for defendants the right to be subjected to punitive damages.

Yet another approach was the Court's establishment of a voluntary ADR program for asbestos cases filed after the cutoff date in *Jenkins v. Raymark Industries Inc.*, 782 F.2d 468 (5th Cir.1986). Most, but not all, defendants elected to participate. The ADR program provided many partial settlements before it was set aside by the Eastern District Court sitting en banc. The ADR program was flawed in three respects. First, under existing law it could not be binding or mandatory. Second, some plaintiffs' counsel were uncooperative and the defendants made it largely ineffective by delay tactics; and third, the defendants' inability to agree among themselves on apportionment of damages doomed the plan.

The Court was then back to the *Jenkins* procedure. However, *Jenkins* also was flawed in that it could not accommodate the large number of cases that had accumulated on the Court's docket.

The Court has now witnessed an evolution in defense strategy employed by Pittsburgh–Corning, Fibreboard and Celotex. Early on these defendants typically settled their cases. Pittsburgh–Corning was a prime mover in getting *Jenkins* settled. A new strategy has now been adopted. Pittsburgh–Corning, Fibreboard and Celotex have adopted a "fortress mentality" and are attempting to avoid liability by obstructing the Court's ability to provide a forum in these cases. It is a strategy that is not unique to East Texas, but is one that is being utilized all across the country. They assert a right to individual trials in each case and assert the right to repeatedly contest in each case every contestable issue

involving the same products, the same warnings, and the same conduct. The strategy is a sound one; the defendants know that if the procedure in *Cimino* is not affirmed, these cases will never be tried.

If the Court could somehow close thirty cases a month, it would take six and one-half years to try these cases and there would be pending over 5,000 untouched cases at the present rate of filing. Transaction costs would be astronomical.

The great challenge presented to the Court by this litigation is to provide a fair and cost effective means of trying large numbers of asbestos cases. It is not enough to chronicle the existence of this problem and to lament congressional inaction. The litigants and the public rightfully expect the courts to be problem solvers.

### THE REAL WORLD

In the real world, the scientific community long ago resolved the issues that continue to be litigated by the courts. Every institution, apart from the courts, that has investigated this remarkable natural mineral has concluded that it is inherently dangerous. The asbestos fibers themselves are invisible. They are easily dispersed into the air when asbestos containing products are handled, such as in application or removal. The scientific community agrees that:

1. There is no safe level of exposure.
2. There is a dose/response relationship that manifests itself in either the type disease that one may contract or the length of latency period between exposure and disease manifestation.
3. Asbestos is a competent producing cause of the diseases of mesothelioma, asbestosis, lung cancer, and pleural disease. Unanimity of opinion is not yet achieved regarding gastrointestinal tract cancers although the evidence has satisfied the Surgeon General.
4. Mesothelioma is an untreatable terminal cancer.
5. Asbestosis is a progressive untreatable disease of the lung.

Asbestos has either been banned or declared hazardous by the Occupational Safety and Health Administration, the National Institute for Occupational Safety and Health, the Environmental Protection Agency and the Surgeon General. These agencies have further concluded that all asbestos fiber types pose similar risks, therefore all fiber types are regulated equally.

During the course of the *Cimino* trial while the question of whether asbestos products were unreasonably dangerous was being litigated once again in Beaumont, the federal courtroom in Tyler was being used by the State Court of Appeals Judges because men in spacesuits were removing asbestos from their chambers.

### THE PLAN

The plan is a simple one and reflects this Court's agreement with the comments of Professor Charles Alan Wright:

> "I was an ex-officio member of the Advisory Committee on Civil Rules when Rule 23 was amended, which came out with an advisory committee note saying that mass torts are inappropriate for class certification. I thought then that was true. I am profoundly convinced now that that is untrue. Unless we can use the class action and devices built on the class action, our judicial system is not going to be able to cope with the challenges of the mass repetitive wrong."

*See* H. Newberg, *Newberg on Class Actions* § 17.06, at 373 (2d ed. 1985).

On February 19, 1990, this Court certified a class under Fed.R.Civ.P. 23(b)(3) consisting of 3,031 plaintiffs with existing cases in the Eastern District of Texas, all claiming an asbestos-related injury or disease resulting from exposure to defendants' asbestos containing insulation products. Seven hundred thirty-three cases were removed as a result of being dismissed, severed or settled. The class consisting of 2,298 plaintiffs went to trial

against Pittsburgh–Corning, Fibreboard, Celotex, Carey–Canada, and ACL.

## PHASE I

Phase I utilized the same procedures approved in *Jenkins v. Raymark Industries, Inc. supra*, to resolve all common issues. The issues were whether each asbestos containing insulation product manufactured by each defendant, settling and non-settling, was defective and unreasonably dangerous, the adequacy of warnings, the state of the art defense and the fiber type defense. The question of punitive damages in the entire case of the 2,298 class representatives was also submitted for jury determination.

## PHASE II

Phase II required a jury finding for each of nineteen worksites during certain time periods regarding which asbestos containing insulation products were used, which crafts were sufficiently exposed to asbestos fibers from those products for such exposure to be a producing cause of an asbestos-related injury or disease and an apportionment of causation among defendants, settling and non-settling.

In other words, the exposure questions to be submitted would be specific as to time, place, craft, and amounts of exposure.

## PHASE III

Phase III is the damage issue. The 2,298 class members were divided into five disease categories based on the plaintiff's injury claims. The Court selected a random sample from each disease category as follows:

| | SAMPLE SIZE | DISEASE CATEGORY POPULATION |
|---|---|---|
| Mesothelioma | 15 | 32 |
| Lung Cancer | 25 | 186 |
| Other Cancer | 20 | 58 |
| Asbestosis | 50 | 1,050 |
| Pleural Disease | 50 | 972 |
| TOTAL | 160 | 2,298 |

The damage case of each trial sample class member randomly drawn was then submitted to a jury. Each plaintiff whose damage case was submitted to the jury is to be awarded his individual verdict and the average verdict for each disease category will constitute the damage award for each non-sample class member.

Plaintiffs have agreed to the procedure, thereby waiving their rights to individual damage determinations.

## THE TRIAL

Phase I began with jury selection on February 6, 1990 and the verdict was returned March 29, 1990. The Court then granted the parties' request for additional preparation time between Phase I and Phases II and III. Two juries were selected on July 3, 1990. The juries sat together for the first five trial days which were devoted to general medical testimony. The juries were then divided and began hearing testimony on groups of plaintiffs and returning damage verdicts. The last verdict for the 160 individual damages cases was received October 5, 1990.

In all, the trial consumed 133 days of trial time and produced 25,348 pages of transcript prepared as daily copy. The docket sheet in the Clerk's office is 529 pages long. The Court has entered 373 signed Orders.

Prior to trial 1,885 sets of interrogatories were answered by the parties and 2,354 depositions were taken, with an additional 800 being taken during trial. Independent medical examinations were conducted of 1,400 plaintiffs.

During the course of the trial, 271 expert witnesses and 292 fact witnesses testified, 6,176 exhibits were received in evidence constituting 577,000 pages of documents. Fifty-eight individual lawyers participated in the in-court presentation of this case which was presided over in varying degrees by four district judges and three magistrates.

If all that is accomplished by this is the closing of 169 cases, then it was not worth the effort and will not be repeated.

## PHASE II—STIPULATION

Phase II of the trial was designed to resolve the issue of the plaintiffs' exposure

to the defendants' products on a class wide basis. The Court's goal in this respect was facilitated by the homogeneous nature of these particular plaintiffs' work histories.

The Court first compiled a list of worksites, various locations consisting mostly of oil and chemical refineries, where the majority of the plaintiffs allegedly were occupationally exposed to asbestos in the course of their employment. The Court next compiled a list of job classifications, or crafts, which the plaintiffs worked in during their employment at the worksites. It was contemplated that any plaintiff whose work history did not include a threshold amount of time in any of the worksites would have the exposure issue tried in an individual mini-trial.

Prior to the Court drafting a verdict form for Phase II, the parties agreed to stipulate as to what the jury findings would have been had Phase II been tried to a jury. The parties stipulated that the jury would have apportioned causation among the defendants in the amounts of 10% causation for each of the non-settling defendants and 13% causation for the settling defendant Johns–Manville Corporation.

The verdict form for Phase II would have been worksites. For each worksite there would have been two interrogatories. The first interrogatory would have asked whether or not each of the various crafts at a worksite was sufficiently exposed to asbestos for that exposure to be a producing cause of the disease of asbestosis [1] during successive time periods. The second interrogatory then would have requested the jury to determine, for each craft and each time period answered affirmatively in the first interrogatory, the percentage of comparative causation, if any, that each defendant's products contributed to the exposure.

## CAUSATION

In order to recover under Texas law, a plaintiff must prove that a defendant's unreasonably dangerous product was a pro-

ducing cause of a plaintiff's injury or disease. *Hartzell Propeller Co. v. Alexander*, 485 S.W.2d 943, 946 (Tex.Civ.App.—Waco 1972, writ ref. n.r.e.). A producing cause is defined as an efficient, exciting, or contributing cause which in a natural sequence of events produces an injury or disease. *Rourke v. Garza*, 530 S.W.2d 794, 800 (Tex.1975). There may be more than one producing cause of an injury or disease. *Id.*

A plaintiff in an asbestos suit need not show that exposure to a defendant's product was the sole cause of the asbestos-related injury or disease. If exposure to the defendant's product combined with other causes to concurrently produce a single injury, the plaintiff may recover from the defendant for the entire injury. *Shipp v. General Motors Corporation*, 750 F.2d 418, 425–26 (5th Cir.1985). The plaintiff need only show that exposure to a defendant's product was a substantial factor in causing the plaintiff's injury. *Gideon v. Johns–Manville Sales Corporation*, 761 F.2d 1129, 1145 (5th Cir.1985).

## PREJUDGMENT INTEREST

For cases in this action filed before September 2, 1987, the issue concerning an award of prejudgment interest is governed by *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985). For those individual cases filed on or after September 2, 1987, prejudgment interest is governed by *Cavnar* as well as by Tex.Rev.Civ.Stat. Ann. art. 5069–1.05 sections 2 and 6 (Vernon Supp.1990).

*Cases Filed Before September 2, 1987*

In *Cavnar*, the Texas Supreme Court held that a prevailing plaintiff in a tort action "may recover prejudgment interest compounded daily (based on a 365–day year) on damages that have accrued by the time of judgment." 696 S.W.2d at 554. The court stated that "prejudgment interest shall accrue at the prevailing rate that exists on the date judgment is rendered according to the provisions of Tex.Rev.Civ.

---

**1.** Asbestosis was used as the threshhold of exposure because both parties' experts agreed on the record that if an individual had sufficient expo-

sure to asbestos to cause asbestosis, there was a sufficient level of exposure to cause any other asbestos-related disease.

Stat.Ann. art. 5069–1.05 section 2. . . ." *Id.* Under Texas law pursuant to *Cavnar,* prejudgment interest is not permitted for future or punitive damages. *Id.* at 555–556.

The issue remaining for this Court to decide is what date should be used to compute prejudgment interest. According to *Cavnar,*

> In wrongful death and non-death personal injury cases, interest shall begin to accrue on both pecuniary and non-pecuniary damages from a date six months after the occurrence of the incident giving rise to the cause of action.

696 S.W.2d at 555. For cases involving a decedent, prejudgment interest is to accrue from the date of death or six months after the injury-causing incident occurred, whichever gives rise to the larger interest award. *Id.*

Plaintiffs argue that prejudgment interest should accrue six months after the date each plaintiff was first exposed to the defendants' asbestos fibers. The defendants contend that the accrual date should be six months after the date each plaintiff was diagnosed as having an asbestos-related injury or disease.

■ Texas law has rejected the diagnosis date as the operative date for computing prejudgment interest. *See Cavnar,* 696 S.W.2d at 555; *American Cyanamid Co. v. Frankson,* 732 S.W.2d 648, 660 (Tex. App.—Corpus Christi 1987, writ ref'd n.r. e.). In an asbestos personal injury case, the incident giving rise to a plaintiff's cause of action is the plaintiff's total exposure to asbestos fibers which results in an asbestos-related injury or disease.

It is scientifically undisputed that asbestosis is a dose/response disease. Asbestos fibers, once inhaled, remain in place in the lung, causing a tissue reaction that is slowly progressive and irreversible. Typically, the disease does not manifest itself until years after initial exposure to asbestos fibers. The duration of this latency period depends to some extent on the individual characteristics of the person exposed. Asbestosis is cumulative as each additional exposure to asbestos produces additional tissue changes. These factors make it im-

possible to determine which exposure or exposures caused the disease. *See Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1083 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).

The disease of mesothelioma, on the other hand, can be caused by a single exposure to asbestos fibers. As with asbestosis, mesothelioma usually involves a long latency period. It is therefore not possible to determine which exposure caused the disease. *See Borel,* 493 F.2d at 1083.

There is authority in Texas to support the proposition that prejudgment interest should accrue six months after a plaintiff's first exposure to asbestos. In *American Cyanamid Co. v. Frankson,* a Texas court held that the "occurrence" in a personal injury case involving a defective drug administered in a series of doses was when the drug was first prescribed by the defendant doctor. 732 S.W.2d at 660. It is also noted that in *Covalt v. Carey Canada, Inc.,* 543 N.E.2d 382, 385 (Ind.1989), the Supreme Court of Indiana has held that, with regard to a latent disease, the "injury begins from the moment the foreign substance is introduced into the body."

■ However, the better reasoned approach is that, in an asbestos suit, prejudgment interest accrues six months after a plaintiff's last exposure to asbestos fibers. It is not possible to determine that any particular exposure to asbestos was the cause of an asbestos related disease, but only that an individual's cumulative exposure, ending with the last date of exposure, was the cause of an asbestos-related disease. The use of the last exposure date as the "incident giving rise to the cause of action" comports with the rationale of *Cavnar*—to provide full compensation for plaintiffs by awarding interest on damages that have actually been sustained. *See* 696 S.W.2d at 554–555. Use of the first exposure date as the operative date would make it possible for a plaintiff to collect prejudgment interest for a period where no injury has yet occurred. As a matter of equity, use of the last exposure date for the accru-

al of prejudgment interest is more appropriate in an asbestos case.

From the foregoing, this Court finds as a matter of law that prejudgment interest in an asbestos personal injury case filed before September 2, 1987 accrues six months after a plaintiff's last exposure to asbestos fibers. Prejudgment interest in such cases shall accrue according to the rate established by Tex.Rev.Civ.Stat. art. 5069–1.05 section 2 (Vernon 1987).

*Cases Filed On or After September 2, 1987*

■ For cases filed on or after September 2, 1987, Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 section 6 (Vernon Supp.1990) provides the following:

(a) Judgment in wrongful death, personal injury, and property damage cases must include prejudgment interest ... Prejudgment interest accrues on the amount of the judgment during the period beginning on the 180th day after the date the defendant receives written notice of a claim or on the day the suit is filed, whichever occurs first, and ending on the day preceding the date judgment is rendered.

(g) The rate of prejudgment interest shall be the same as the rate of postjudgment interest at the time of judgment and shall be computed as simple interest.

Pursuant to *Cavnar*, prejudgment interest does not apply to future and punitive damages in these cases. *Cavnar*, 696 S.W.2d at 555–56. In addition, prejudgment interest in these cases shall accrue at the rate established by Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 section 2 (Vernon Supp.1990).

Although the Court notes this modification in Texas law, it is also noted that the parties have stated on the record that the Phase II stipulation, setting the defendants' liability in terms of percentages of comparative causation pursuant to *Duncan*, applies to all of the plaintiffs' cases, including those filed after September 2, 1987. Since the amount of the plaintiffs' actual damages will be determined pursuant to Texas law under *Duncan*, the amount of prejudgment interest will be calculated according to the same law.

## JOHNS–MANVILLE SETTLEMENT

■ Each of the plaintiffs in this case has previously reached a non-cash settlement agreement with an insolvent defendant, Johns–Manville Corporation. The Court orders that the non-settling defendants shall be jointly and severally liable to each plaintiff for the amount of his or her settlement with Johns–Manville. It is further ordered that Johns–Manville's financial obligation to the individual plaintiffs under the settlement agreement is hereby assigned to the non-settling defendants. The amount of the assignment shall not exceed Johns–Manville's percentage of actual damages as set by the jury in this case.

This transfer of an insolvent defendant's non-cash settlement obligation to the non-settling defendants under the present circumstances follows the ruling in *McNair v. Owens–Corning Fiberglas Corp.*, 890 F.2d 753 (5th Cir.1989). In *McNair*, the plaintiffs received promissory notes from two settling defendants. The district court refused to reduce the non-settling defendants' liability by the amount of the notes, and instead assigned the notes to the non-settling defendants. 890 F.2d at 755. The Fifth Circuit upheld the assignment, noting that, "at the time the judgment was entered, the [plaintiffs] were not entitled to the $7,200 [the cash value of the notes] because payment of the notes was [ ... ] contingent on the outcome of [other] litigation [ ... ]." at *Id.* at 756.

The plaintiffs in the present case likewise are not entitled to the cash value of their settlement. Under the settlement agreement, Johns–Manville has promised to pay the plaintiffs a specified sum of money over a period of years, with the first payment not due until 1991. The settlement agreement is, in effect, a promissory note. Payment of this "note" is contingent on the outcome of the unstable Johns–Manville Corporation bankruptcy proceedings and on the continued financial viability of the Johns–Manville Trust Fund, which has

reached a critical condition. At the time of the entry of this Order all payments by the Manville Trust have been stayed by the New York Court. *See In re Joint Eastern and Southern District Asbestos Litigation; In re Johns–Manville Corp.*, NYAL (BNY Order, Nos. 82 B 11656—82 B 11676 (Unpublished Order dated Nov. 6, 1990). The future of the Manville Trust payments is no better than the Fibreboard notes in *McNair*.

The Court recognizes that *McNair* involved a case governed by Tex.Civ.Prac. & Rem.Code Ann. §§ 33.001–.016 (Vernon Supp.1989), unlike the cases of the majority of plaintiffs in the present action which are governed by *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex.1984). *McNair* states that § 33.013 of the statute, "clearly contemplates that in some cases (the present case included) a defendant will be liable for a percentage of total damages greater than the defendant's percentage of responsibility." 890 F.2d at 753. In other words, it is this section's imposition of joint and several liability which justifies a shift of a defendant's liability and the risk of loss to the non-settling defendants.

This reasoning in *McNair* is applicable to the cases governed by *Duncan* and becomes more compelling under the policy concerns expressed in that case. As the Texas Supreme Court stated in *Duncan:*

"The existence of joint and several liability becomes important when one or more defendants are insolvent. When a defendant is insolvent, the goal of allocating the loss among those responsible cannot be achieved. Nevertheless, joint and several liability in such cases furthers the fundamental policy of tort law to compensate those who are injured." [footnote omitted] 665 S.W.2d at 429.

The assignment in this case does not violate the *Duncan* rule that the defendant's liability shall be reduced by the percent share of causation assigned to the settling tortfeasors, *Id.*, because as in *McNair*, the non-settling defendants' total liability for damages is not increased. The defendants will be made whole when the amounts due under Johns–Manville's promissory note are paid directly to the liable defendants. *McNair*, 890 F.2d at 756. It merely imposes the risk created by Johns–Manville's financial status on the defendants instead of the plaintiffs, which *Duncan* explicitly approves of. *Duncan*, 665 S.W.2d at 429.

Furthermore, the parties have agreed that the defendants' liability for all of the cases will be determined according to the percentages of causation set forth in the Phase II stipulation. Thus, those cases which would have been governed by the Texas tort reform statute are now governed by Texas law under *Duncan*. The joint and several liability of the defendants is the same for all of the cases and the reasoning behind the assignment in *McNair* should apply to all of the cases.

## REMITTITUR AND NEW TRIALS

The Court has examined the verdicts in the cases of the nine class representatives and the 160 trial sample plaintiffs and has ordered remittiturs in 34 of the pulmonary and pleural cases and in one mesothelioma case. The Court has granted a new trial in one mesothelioma case.

The usual remittitur analysis was conducted by the Court. However, in these cases the Court was required also to examine the medical evidence to determine which cases had progressed medically. The Court noted that many cases that earlier on had diagnosis of pleural disease or pulmonary asbestosis with limited fibrotic development had markedly changed as a result of disease progression by the time the cases actually went to trial.

## PUNITIVE DAMAGES

■ In Phase I of this trial, the jury found the non-settling Defendants grossly negligent and held them liable for punitive damages. In response to Interrogatory VII of the Phase I verdict form, the jury assessed a punitive damages multiplier "for each $1.00 of actual damages" in the following amounts:

| Carey–Canada | $1.50 |
| Celotex | $2.00 |
| Fibreboard | $1.50 |
| Pittsburgh–Corning | $3.00 |

This use of a punitive damage multiplier was suggested in *Jenkins v. Raymark Industries, Inc.,* 782 F.2d 468, 474 (5th Cir. 1986).

A plaintiff is entitled to recover punitive damages under Texas law if the evidence supports a jury finding of gross negligence on behalf of the defendant. "The critical issue in Texas punitive damages law is excessiveness or 'reasonable proportionality.'" *Jenkins v. Raymark Industries, Inc.,* 782 F.2d 468, 474 (5th Cir.1986). Exemplary damages must be reasonably proportioned to actual damages. *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex. 1981). This court does not find the amount of the multipliers to be excessive as to suggest that passion rather than reason motivated the jury. *See Edwards v. Armstrong World Industries, Inc.,* 911 F.2d 1151, 1154 (5th Cir.1990).

The issue which remains is how to apply the multipliers to the actual damages found by the jury. Plaintiffs argue that the amount of punitive damages assessed against each defendant should be determined by applying the multiplier to the total amount of compensatory damages found by the jury for each plaintiff and contend that under the wording of Interrogatory VII, this is the result the jury anticipated and intended. The defendants argue that the multipliers should be applied only to the percentage of liability for actual damages allocated to each of the defendants by the jury. A third alternative is to apply the multipliers to the amount for which each defendant is jointly and severally liable.

Taking into account equitable considerations, and in the nature of a remittitur, the Court has decided to apply the multipliers set for a defendant to that defendant's allocated share of actual damages. This ruling also most closely comports with the holding in *Edwards v. Armstrong World Industries, Inc.,* 911 F.2d at 1154.

The defendants' allocated share of actual damages to which the multipliers will be applied has been altered by the fact that one of the non-settling defendants, Celotex, filed for Chapter 11 reorganization soon after the conclusion of the trial. Because the defendants are jointly and severally liable for actual damages, Celotex's percentage of causation will be divided among the two remaining defendants, Fibreboard and Pittsburgh–Corning, and each of their shares of actual damages will increase by half of Celotex's share. This is the amount to which the multipliers will be applied. During the trial the parties did not present for the jurys' consideration evidence relating to the net worth of the defendant companies, the extent of their insurance coverage, or how much punitive damages each defendant has actually paid in the past in asbestos cases.

## CONTRIBUTORY NEGLIGENCE AND SMOKING

The parties were instructed that all evidence relating to any alleged contributory negligence of the plaintiffs was to be presented during Phase III of the trial.

The defense of contributory negligence requires findings that the victim was negligent, or failed to act as an ordinary, prudent person, and that the victim's negligence was a proximate cause of the injury or damages. *Brown v. Edwards Transfer Co.,* 764 S.W.2d 220, 223 (Tex.1988). Consequently, a plaintiff's smoking may only be considered contributory negligence if the plaintiff is suffering from an asbestos-related disease which is synergistically linked to smoking. Furthermore, the defense of contributory negligence requires a showing that the plaintiff had subjective knowledge and appreciation of the danger of a product. *Terminix, Inc. v. Right Away Foods Corp.,* 771 S.W.2d 675, 682 (Tex.App.—Corpus Christi 1989, *writ denied*). For smoking to be considered contributory negligence, it must be shown that the plaintiff had subjective knowledge of the synergistic relationship between the asbestos-related disease and smoking and appreciated the danger of continued smoking.

These elements of contributory negligence likewise apply to the alleged failure of a plaintiff to wear a respirator and the failure to follow a doctor's advice.

In cases where there was no evidence of smoking constituting contributory negligence, evidence of a plaintiff's smoking was still allowed on the issue of damages to show quality of life and life expectancy.

## ASBESTOS CORPORATION LIMITED

A majority of the shares of ACL is owned by the Province of Quebec, Canada. This fact establishes ACL's status as a foreign instrumentality under the Foreign Sovereign Immunities Act. *See* 28 U.S.C. 1603(b) (Supp.1990). Accordingly, the Court granted ACL's motion for a nonjury trial. 28 U.S.C. 1330(a) (Supp.1990).

As set out in the Findings of Fact and Conclusions of Law, the Court found that ACL knew or should have known as early as 1935 that asbestos workers and household members of asbestos workers were at risk of getting an asbestos-related injury or disease from the application, use or removal of asbestos containing insulation products. The Court found that from 1951 until 1961, Fibreboard Corporation purchased over 50% of its raw asbestos from ACL. The Court also found that ACL had actual knowledge that the raw asbestos it supplied to Fibreboard Corporation was being made into insulation products and sold by Fibreboard without an adequate warning.

In the Conclusions of Law, the Court calculated ACL's percentage of responsibility for actual damages awarded by the jury by using a formula which takes into account the proportion of ACL's raw asbestos which was incorporated into Fibreboard's products from 1951 to 1961, and the number of months during that period that a plaintiff was exposed to Fibreboard's products.

ACL's liability to the plaintiffs arises through the plaintiffs' exposure to Fibreboard's products which contained asbestos supplied by ACL. There was sufficient evidence presented in Phase I to support a finding that the Phase I plaintiffs were exposed to asbestos supplied by ACL through exposure to Fibreboard's products. ACL was not a party to the Phase II stipulation; therefore, the contents of the stipulation may not form the basis for liability against ACL. The Court has heard no independent evidence of exposure to Fibreboard products from which the Court could make findings to form the basis of liability against ACL for its fiber contribution to the Fibreboard insulation products.

■ As set out in the Findings of Facts and Conclusions of Law, any claim against ACL which was not filed within two years preceding the date that ACL received notice of the class action is barred by the statute of limitations. Of the nine plaintiffs in Phase I who were awarded damages, only the claim of Norman Atchison is not barred by the statute of limitations. Of all of the members of the class, ACL remains liable only to this one plaintiff.

## STATISTICS

Phase III of the plan utilizes the science of statistics, or more specifically, inferential statistics. Aristotle is generally credited with launching the science of collection of comparative information by gathering data on 158 different city-states as set out in his *Politeiai* in the 4th century B.C.[2] During the Renaissance, the Germans refined the methodology of information gathering on the resources of states and gave it the name, "Staatenkunde." By 1660, it was incorporated into curriculum in German universities. Gottfried Achenwall, at the University of Gottingen, first used the word "statistics" in print in 1749. The British redefined the term to incorporate what had been called "political arithmetic." John Graunt's attempt to draw inferences from mortality data accumulated in London was hampered by the lack of a probability theory, but it was sufficient to gain him

**2.** The following brief summary of the history of statistics draws heavily on R. Larson and M.

Marx, *Statistics*, 13–18 (1990).

entrance into the Royal Society of London. His landmark treatise in 1662, "National and Political Observations Upon the Bills of Mortality," resulted in his being considered the world's first statistician. Edmund Halley, of "Halley's comet" fame, subsequently published a book which laid the foundation for the theory of annuities and the creation of mortality tables.

It was the French, however, who added the missing link—a comprehensive theory or calculus of probability. The basic principles of the theory of probability evolved from the correspondence between Blaise Pascal and another distinguished French mathematician, Pierre Fermat, concerning a gambling question posed to Pascal by a French nobleman. The first bell-shaped curve appeared in 1733, and with the publication of *Theorie Analytique des Probabilities* by Laplace in 1812, statistics came of age.

The science of statistics is now universally accepted, exerting the most profound influence on our daily lives. "The objective of statistics is to make an inference about a population of interest based on information obtained from a sample of measurements from that population."[3] For example, statistical sampling plays a critical role in medical and pharmaceutical research. In 1954, a sample of 400,000 children was used to measure the effectiveness of the Salk vaccine for polio.[4] Similar testing of new drug products has increased in recent years due to the stringent requirements of the Food and Drug Administration, aiding in the development of birth control pills, rubella vaccines, chemotherapeutic agents, and countless other important pharmaceuticals.[5]

As in medical research, private industries employ statistical techniques in the development and testing of new products. Random sampling is used in the production process for many diverse tasks, such as maintaining the dimension requirements for the plastic cards used in automatic bank teller machines[6] or testing the specific gravity of laundry detergent.[7] Statistical techniques are particularly valuable in the field of marketing. For example, researchers recently tested a sample of 1,277 people using questionnaires regarding 80 television commercials in order to determine the attributes of a likeable television advertisement.[8] The insurance industry likewise makes widespread use of statistics and probability theory, particularly in the area of rate setting.[9]

The effect of statistics reaches well beyond the market place or our medicine cabinet. In the field of education, statistical techniques are used in the administration and evaluation of various standardized tests. Studies based on random sampling may help improve curriculum for special needs pupils, such as language-minority students[10] or illiterate adults.[11] Statistics have likewise become very important in the political arena. Nearly every day we receive progress reports on the rise or fall of the President's popularity as determined by public opinion polls. During the previous administration, a telephone survey of a random sample of 1,000 registered voters was conducted to assess the effect of the President's support of the INF Treaty on for-

3. L. Ott & W. Mendenhall, *Understanding Statistics,* 10 (5th ed. 1990).

4. *Id.* at 7–8.

5. *Id.* at 8.

6. D. Anderson, D. Sweeney, & T. Williams, *Statistics: Concepts and Applications,* 247–48 (1986).

7. *Id.* at 45–46.

8. Biel & Bridgwater, *Attributes of Likeable Television Commercials,* 30 Journal of Advertising Research 38 (1990).

9. *See* Tomberlin, *Predicting Accident Frequencies for Drivers Classified By Two Factors,* 83 Journal of the American Statistical Association 309 (1988).

10. Lucas, Henze, & Donato, *Promoting the Success of Latino Language–Minority Students: An Exploratory Study of Six High Schools,* 60 Harvard Educational Review 315 (1990).

11. Smith, *The Development and Use of An Instrument for Assessing Adults' Attitudes Toward Reading,* 23 Journal of Research and Development in Education 156 (1990).

eign policy "hard-liners."[12] Moreover, the science of statistics frequently proves to be invaluable in such areas as evaluating the effects of changes in the law[13] and projecting budgetary needs. At the present, the Federal Judiciary is involved in an on-going time study using a sample of all cases filed in the district courts for a two week period. The Federal Judicial Center will use the data obtained to help project the need for additional federal judges and magistrates.

Acceptance of statistical evidence is now commonplace in the Courts. The following illustrations demonstrate the diverse legal contexts in which statistics, particularly random sampling, has been used. Statistical evidence occurs frequently in Title VII employment discrimination cases, most often demonstrating a pattern or practice of discrimination on the part of the employer. Although noting that statistical proof is not irrefutable, the United States Supreme Court approved the use of statistical evidence to establish the plaintiff's *prima facie* case in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 334–40, 97 S.Ct. 1843, 1854–57, 52 L.Ed.2d 396 (1977). *See also Hazelwood School Dist. v. United States*, 433 U.S. 299, 307–13, 97 S.Ct. 2736, 2741–44, 53 L.Ed.2d 768 (1977) (remanded to trial court to allow employer to present statistical evidence as to its hiring after it became subject to Title VII); *Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 653–57 (5th Cir.1983), *cert. denied*, 466 U.S. 927, 104 S.Ct. 1709, 80 L.Ed.2d 182 (1984) (court approved use of census data in gender discrimination case); *Vuyanich v. Republic Nat. Bank*, 505 F.Supp. 224 (N.D.Tex.1980), *vacated on other grounds*, 723 F.2d 1195 (5th Cir. 1984), *cert. denied*, 469 U.S. 1073, 105 S.Ct. 567, 83 L.Ed.2d 507 (1984) (extensive use of statistical studies of bank's personnel; some data rejected, but general statistical approach recognized including detailed description of regression analysis). *See generally* Gwartney, Asher, Haworth & Haworth, *Statistics, the Law and Title VII:*

*An Economist's View*, 54 Notre Dame Law 633 (1979).

Statistical evidence has been used in antitrust cases to project pre and post merger market share and market concentration. *See State of Cal. v. American Stores Co.*, 872 F.2d 837, 841–42 (9th Cir.1989), *rev'd on other grounds*, —— U.S. ——, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990); *Monfort of Colorado, Inc. v. Cargill, Inc.*, 591 F.Supp. 683, 705 (D.Colo.1983), *rev'd on other grounds*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) (although not conclusive, sufficiently high concentration and market share statistics can result in a *prima facie* showing of a violation of the Clayton Act). In trademark infringement suits, statistical sampling is useful in determining consumer product identification and confusion regarding trademarks. *See Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 854–58 (7th Cir. 1982) (survey of children between the ages of 6 and 12 in order to determine if Plaintiff's toy car was confused with Defendant's "Dukes of Hazzard" toy car); *Exxon Corp. v. Texas Motor Exchange, Inc.*, 628 F.2d 500 (5th Cir.1980) (survey of 515 licensed drivers indicated high possibility of confusion between "Texon" and "Exxon"); *Zippo Manufacturing Co. v. Rogers Imports, Inc.*, 216 F.Supp. 670 (S.D.N.Y.1963) (sample of 1,500 adult smokers to assess product identification of cigarette lighters); *See generally* Lipton, *A New Look at the Use of Social Science Evidence in Trademark Litigation*, 78 The Trademark Reporter 32 (1988); Walker & Monahan, *Social Facts: Scientific Methodology as Legal Precedent*, 76 Cal.L.Rev. 877 (1988). In *R.J. Reynolds Tobacco Co. v. Loew's Theatres, Inc.*, 511 F.Supp. 867 (S.D.N.Y. 1980), the court permitted evidence of a professionally conducted consumer preference survey demonstrating the effect of an advertisement on consumers as a means of proving irreparable harm.

---

**12.** Sigelman, *Disarming the Opposition: The President, the Public, and the INF Treaty*, 54 Public Opinion Quarterly 37 (1990).

**13.** See *Garfinkel & Klawitter, The Effect of Routine Income Withholding of Child Support Collections*, 9 Journal of Policy Analysis and Management 155 (1990).

Statistical evidence frequently comes into play in civil rights cases. A class of Haitian refugees claiming discrimination in exclusion procedures was allowed to present a binomial analysis showing the number of Haitian versus non-Haitian refugees detained and paroled in *Jean v. Nelson*, 711 F.2d 1455, 1487–90, 1494–99 (11th Cir.1983), *vacated on other grounds*, 727 F.2d 957 (11th Cir.1984), *aff'd*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). In *Johnson v. City of Arcadia, Fla.*, 450 F.Supp. 1363 (M.D.Fla.1978), the court inferred *de facto* discrimination from extensive historical statistical data presented by African–American citizens claiming deprivation of equal municipal services. Statistical data has also been used to prove up discrimination in jury selection cases. *See Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (statistical evidence drawn from census data and grand jury records established *prima facie* case for discrimination against Hispanics in the Texas "key-man" selection system for grand juries); *Machetti v. Linahan*, 679 F.2d 236 (11th Cir.1982), *cert. denied*, 459 U.S. 1127, 103 S.Ct. 763, 74 L.Ed.2d 978 (1983) (statistical evidence showing disparity between percentage of females in adult populations and percentage of females on jury lists indicated unfair representation). Moreover, public opinion polls have been allowed in some state courts as evidence of community standards in obscenity cases. *See Carlock v. State*, 609 S.W.2d 787 (Tex.Cr. App.1980); *Saliba v. State*, 475 N.E.2d 1181 (Ind.App.2d Dist.1985).

Evidence based upon statistical sampling has particularly received court approval in cases involving government inspection of large quantities of goods. *See United States v. 449 Cases Containing Tomato Paste*, 212 F.2d 567 (2nd Cir.1954) (court approved inspector's testing of samples, rather than requiring the opening of all cases); *E.K. Hardison Seed Co. v. Jones*, 149 F.2d 252 (6th Cir.1945);[14] *United States v. 43½ Gross Rubber Prophylactics*, 65 F.Supp. 534 (D.Minn.1946), *aff'd*, 159 F.2d 881 (8th Cir.1947) (court determined that shipment was misbranded based upon evidence of a sample which indicated a potential of 1,500 defective prophylactics in shipment).

In the area of torts, statistics have been used to prove both liability and damages. The New Jersey Supreme Court has, in at least two cases, relied upon statistics showing the correlation between the theft of cars with keys left in the ignition and automobile accidents in the liability phase of a trial. *See Hill v. Yaskin*, 75 N.J. 139, 380 A.2d 1107 (1977); *Zinck v. Whelan*, 120 N.J.Super. 432, 294 A.2d 727 (1972). Courts frequently permit evidence of life-expectancy or mortality tables when determining damages. *See Ageloff v. Delta Airlines, Inc.*, 860 F.2d 379 (11th Cir.1988); *Espana v. United States*, 616 F.2d 41 (2nd Cir.1980); *Larsen v. International Business Machines Corp.*, 87 F.R.D. 602 (E.D. Pa.1980) (use of work-life tables). Statistical evidence has proven to be particularly useful in the determination of lost or future revenues, profits or earnings. *See In re. Knickerbocker*, 827 F.2d 281, 288–89 (8th Cir.1987) (court allowed expert to testify as to future revenues, based upon historical analysis and price predictions); *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1538–40 (11th Cir.1985) (expert testified as to profit projections based on industry norms); *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926–28 (2nd Cir.1977) (court allowed statistical analysis to predict future success of record which reached No. 61 on Billboard's "Hot Soul Singles" chart; analysis included every song that had reached No. 61 on the

---

**14.** The Court made the following observation regarding sampling:

Human experience has taught us that one thing concurrently may be associated with another. In other words, the presence of smoke indicates the presence concurrently of fire.

Thus it is that samples are receivable in evidence to show the quality or condition of the entire lot or mass from which they are taken. The prerequisites necessary to the admission in evidence of samples are that the mass should be substantially uniform with reference to the quality in question and that the sample portion should be of such nature as to be fairly representative.

*Hardison*, 149 F.2d at 256.

chart); *Thomas v. American Cystoscope Makers, Inc.,* 414 F.Supp. 255, 270 (E.D.Pa. 1976) (court allowed statistical evidence regarding income of medical partnerships to predict future income of a medical partnership).

The reasons the courts have come to rely on statistics are the same reasons that society embraces the science. It has been proved to provide information with an acceptable degree of accuracy and economy.

Departing from the area of statistical evidence, it is incumbent upon the Court to note that various courts have permitted, or even advocated, the use of formulas or models for damage awards in class action suits, rather than employing an individual-by-individual approach. In *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 258–63 (5th Cir.1974), a Title VII case, the court made the following observation:

> However, when the class size or the ambiguity of promotion or hiring practices or the multiple effects of discriminatory practices or the illegal practices continued over an extended period of time calls forth the quagmire of hypothetical judgment discussed earlier, a class-wide approach to the measure of back pay is necessitated. It should be emphasized that this is not a choice between one approach more precise than another. Any method is simply a process of conjectures. (footnote omitted)

*Pettway,* 494 F.2d at 261.

The *Pettway* Court followed with several suggestions for computing approximate pay rates and pay periods using a class-wide approach. One suggested method involved the averaging of five pay rates, awarding each claimant back pay based on the average rate multiplied by years of employment. *Id.* at 262. Another suggested approach involved the use of a comparability formula in which earnings of a group of employees not injured by discrimination, comparable to the class according to specific relevant variables, are approximated and applied to the class. *Id.* at 263. On appeal after remand, the Court reiterated its approval of the above mentioned class-wide remedies. *Pettway v. American Cast Iron*

*Pipe Co.,* 576 F.2d 1157, 1222 (5th Cir. 1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). The court also concluded that *"as a last resort* the [trial] court may utilize the individual-by-individual approach...."* (emphasis added by court). *Id.*

The Court does not perceive the method of extrapolation used herein to be substantially dissimilar to the methods advocated in *Pettway.* As in *Pettway,* the desirability of proceeding on a class-wide, rather than individual basis, is readily apparent.

Against this backdrop, defendants assert that statistical methodology is somehow inappropriate for mass tort cases. This contention fails when examined under the same microscope used in other cases. The method incorporated into Phase III produces a level of economy in terms of both judicial resources and transaction cost that needs no elaboration. Moreover, defendants cannot possibly suggest that no form of statistical evidence is appropriate in this case. They frequently used statistics during this trial. At the outset, Owens–Illinois submitted a statistical analysis of a telephone survey conducted by Jury Analyst, Inc. on a sample of 500 people from each division in this district in support of its Motion to Transfer Venue. Defendants Fibreboard and Pittsburgh–Corning subsequently adopted that motion. The voluminous medical literature offered by both sides contains innumerable examples of statistical surveys and analysis.

Defendant Pittsburgh–Corning relied upon the testimony of Dr. Thomas Robert Savings to estimate the percentage of Pittsburgh–Corning products in the Golden Triangle area. Dr. Savings made an extensive statistical analysis to compute the estimated market share for Pittsburgh–Corning which was then extrapolated to the chemical plants in the area. The Court is of the opinion that defendants' extensive reliance upon statistical analysis and extrapolation considerably weakens their argument against the use of the same by the Court. However, the question of whether the damage phase methodology of this trial

is sufficiently accurate requires further examination.

When *Cimino* was certified, the Court had two options regarding damages—a lump sum award or the utilization of a random sample. The lump sum approach was rejected in *In re Fibreboard Corp.*, 893 F.2d 706 (5th Cir.1990). There appears to have been some confusion regarding the use of illustrative plaintiffs in the first plan with the utilization of random sampling techniques in the second plan. The original plan would have produced a lump sum award and the illustrative plaintiffs were just that—they would have illustrated typical cases for the jury's benefit in determining a lump sum award for the entire class. The illustrative plaintiffs' cases would not have been decided, and extrapolation was not part of the equation.

When the Court set the original plan aside and adopted statistical sampling as the only remaining option, it could have conducted a hearing and made necessary findings on the representativeness question—that is, what sample sizes are appropriate for each disease category—prior to trial of Phase III. However, the Court elected to defer that decision until after the damage trial to take the question of representativeness a step further. The Court determined that the impact of these cases was of sufficient importance that the Court should not limit its consideration to a "Statistics 101" analysis, but should also examine the samples to determine whether they were representative in fact. This approach requires the makeup of the randomly drawn samples to be compared to the population of each disease category.

The post-trial hearing held November 6, 1990, has persuaded the Court that the samples used were, in fact, representative. When setting the sample size for each disease category, the Court sought a confidence level of 95%, in other words ± 2.00 standard deviations. The testimony adduced at the post-trial hearing indicates that the actual precision level achieved by the samples exceeds that sought by the Court. Professor Ronald G. Frankiewicz, a professor at the University of Houston who holds a Ph.D. in evaluation, measurement and statistics, conducted numerous statistical tests comparing the goodness-of-fit between the samples and their corresponding disease categories, considering the dichotomous, continuous and categorical variables. Frankiewicz's testing indicates that, with two minor exceptions,[15] the samples on the whole achieved a 99% confidence level, or in other words, a standard deviation of ± 2.56.

Defendants elected to present no evidence at the hearing either attacking Frankiewicz's methodology or comparing the sample to the entire population or class. The defendants had a data base on the 160 sample members from the trial of those cases and the data base on the entire class that included depositions in all the cases, medical examinations of approximately 1,400 class members as well as other discovery that detailed employment history, wage history, medical history, medical records and expenses, and family background. The Court can only conclude that if Frankiewicz's methodology was inappropriate or if the sample was, in fact, skewed and not representative of the class, the Court would have heard that evidence.

The Court is of the opinion that the distribution of variables between the samples and their respective subclasses is comparable. The Court finds that this procedure has proved to be a valid statistical exercise. The goodness-of-fit exceeded the acceptable limits articulated by the Court, and the Court perceives no need to try any more cases prior to extrapolation.

■ The Court finds no persuasive evidence why the average damage verdicts in each disease category should not be applied

---

**15.** Frankiewicz goodness-of-fit tests for the disease category "Other Cancers" indicates a 98% confidence level for the dichotomous variable of race. (*See* Plaintiff's Exhibit "Frankiewicz No. 1," Table 3.) Additionally, in testing the goodness-of-fit at a 99% confidence level comparing the stratified sample with the entire population, Frankiewicz's testing indicated a lower proportion of "living" cases, according to the dichotomous variable of living, in the sample than in the general population. (*See* Plaintiff's Exhibit "Frankiewicz No. 1," Table 6.)

to the non-sample members. The averages are calculated after remittitur and take into consideration those cases where plaintiffs failed to prove the existence of an asbestos-related injury or disease resulting in a zero verdict. Individual members of a disease category who will receive an award that might be different from one they would have received had their individual case been decided by a jury have waived any objections, and the defendants cannot show that the total amount of damages would be greater under the Court's method compared to individual trials of these cases. Indeed, the millions of dollars saved in reduced transaction costs inure to defendants' benefit.

This Court, during the inception and implementation of the plan, had one additional concern—a concern similar to one expressed by Judge Higginbotham in *Vuyanich v. Republic Nat. Bank*, 505 F.Supp. 224, 394 (N.D.Tex.1980), *vacated on other grounds*, 723 F.2d 1195 (5th Cir.1984), *cert. denied*, 469 U.S. 1073, 105 S.Ct. 567, 83 L.Ed.2d 507 (1984). The concern is that dispute resolution under our system cannot be reduced to formula. Computers cannot replace judges who bring to their tasks experience and sensitivity to due process as well as the basic fairness that is at the core of our judicial system. Careful scrutiny has persuaded this Court that, in this case, science has assumed its proper role, a role that is in aid of the court and not in replacement of it.

The siren call of numerical display has here too been resisted. It also cannot be said that this effort was not a trial. *Cimino* was a trial in the traditional sense. The 373 Orders entered and the numerous other rulings were the product of judicial opinion, not calculations. The liability verdicts and 160 damage awards were made by three juries in a traditional trial.

### DUE PROCESS

■ Defendants, taking comfort in the language of *In re Fibreboard Corp., supra,* object to the Court's plan and assert that due process, even in the asbestos context, entitles defendants to a traditional one-on-one trial in each of the 2,298 cases. In defendants' eyes there are no common issues, irrespective of the fact that the products in each trial would be identical, the warnings would be identical, and the exposure evidence for each worksite during the time periods inquired about for each craft would be identical. Defendants further point out that damage elements vary between plaintiffs, such as the nature and extent of disease, lost wages, medical expenses, pain and suffering, and mental anguish.

In an attempt to avoid once again being sacrificed on the altar of due process, the Court has set out to address the variables that were bothersome to the Court of Appeals in *In re Fibreboard*.

It was undisputed that the product list submitted to the jury in Phase I was comprised of insulation products manufactured by the defendant indicated, that they contained asbestos, and were capable of producing dust in application, use, or removal. The warnings of each of the defendants and the time periods the products were placed in the stream of commerce were also not disputed. The jury considered each individual product and found them, once again, to be defective and unreasonably dangerous at all times marketed. These factors, therefore, would not vary from plaintiff to plaintiff. What might vary is which products a particular plaintiff was exposed to in sufficient quantities for that exposure to be a producing cause of an asbestos-related injury or disease, and when the plaintiff may have been exposed. These variables became constants as a result of the stipulation in the exposure phase—Phase II.

What remained then was the usual variables that are reflected by elements of damages in a personal injury case for a particular plaintiff. The Court addressed these variables by structuring a damages only trial in Phase III that was indistinguishable from a reverse bifurcation damage trial that defendants favor in many parts of the country. The Court then, by way of variable reduction, divided the plaintiffs into five categories by disease, from which the

samples were drawn. The 160 damage cases tried with all the variables inherent in such cases produced a result to a 99% confidence level the average of which would be comparable to the average result if all cases were tried. If the existence of variables are the driving force behind defendants' due process argument, then due process has been served.

However, a due process concern remains that is very troubling to the Court. It is apparent from the effort and time required to try these 160 cases, that unless this plan or some other procedure that permits damages to be adjudicated in the aggregate is approved, these cases cannot be tried. Defendants complain about the 1% likelihood that the result would be significantly different. However, plaintiffs are facing a 100% confidence level of being denied access to the courts. The Court will leave it to the academicians and legal scholars to debate whether our notion of due process has room for balancing these competing interests.

Judges at both trial and appellate court levels seldom have the luxury of the time required for true reflection on the consequences of what we do and how we may do it better. All too often the constraints of time militate in favor of traditional methodology even when traditional methods consistently produce a result that is quite unacceptable to litigants, the courts, and to society. The asbestos litigation mess is a classic example of this conundrum. More times than not, therefore, we find ourselves abdicating this role to others.

In commenting on the fact that the last few years have seen a revolution in thinking about mass toxic torts, Deborah Hensler, Research Director of the Institute for Civil Justice at the RAND Corporation, is one who has stepped into the breach. Professor Hensler notes:

"When scholars and practitioners assess the appropriateness of applying various formal aggregative approaches to mass torts, they explicitly or implicitly use the 'traditional tort approach' as their standard for comparison, in effect accepting the version of legal reality that this in-corporates. Judged against this standard, formal aggregative procedures frequently appear to fall short. This article argues that this version of legal reality is factitious, both with regard to process and substantive outcomes, making its use as a standard for judging formal aggregative procedures highly dubious."

Hensler, *Resolving Mass Toxic Torts: Myths and Realities*, 1989 U.Ill.L.Rev. 89, 90 (1989).

The study concludes with what is common knowledge to judges who are familiar with these cases:

1. The traditional tort approach in practice falls far short of the goals ascribed to it in both routine and mass tort cases.

2. Personalized case-by-case processing is not possible and not desired by lawyers and judges.

3. Informal aggregation is many times embarked upon in such an ad hoc fashion that its implications are not carefully considered, and its consequences not subjected to careful scrutiny.

4. The expanding use of formal aggregative procedures provide for litigant control over the litigation process, more opportunity for litigant participation in the process, and a better match between victims' losses and compensation for those losses.

It is this Court's opinion that due process in the asbestos context should not be analyzed in the narrow, traditional, one-sided view of defendants, but should also encompass the impact on plaintiffs and even the obvious societal interest involved. To take defendants' argument is to embrace perfection as the benchmark; this Court submits that a confidence level of 99% will do.

### THE FUTURE

The judges to whom the non-sample class member cases are assigned may now entertain motions and enter judgments consistent with this Opinion and Order. This Court will enter judgment for the class representatives, the trial sample members

of the class, and its assigned cases. Plaintiffs may submit as part of this motion for judgment an affidavit concerning the termination of exposure for each individual plaintiff as reflected by that plaintiff's employment records. The affidavit may then be used by the Court to determine the time for calculating pre-judgment interest.

Judgment may be entered against Celotex only in the event the bankruptcy court lifts the stay for that purpose.

The question of whether asbestos containing insulation products are defective and unreasonably dangerous, the adequacy of warnings, the state-of-the-art, and the fiber type defenses should not be relitigated again in the Eastern District of Texas.

The question of apportionment of responsibility among all defendants should be established by one trial or by stipulation.

Damages must be determined in the aggregate. Whether it is by the mechanism of the Court's plan or by some other procedure approved or suggested by the Court of Appeals, without the ability to determine damages in the aggregate, the Court cannot try these cases.